Metcalf
vs.
Watkins.

[a] Marsh. 459.

---

ANTHONY H. METCALF vs. MILES T. WATKINS.

*Error from the County Court of Madison County.*

A note or bill made for the especial accommodation of an individual, to enable him to raise money by its discount, at a rate beyond the legal interest, is usurious in the hands of an innocent purchaser, and he cannot maintain an action on it; being void in its original formation.

The declarations of the person for whose accommodation the paper is made, not evidence.

This was an action on a bill of exchange, instituted by Watkins the holder, against Metcalf the drawer.

In the action below, the defendant Metcalf plead,

First—That the bill was drawn by him for the accommodation of one Roberts, without any consideration on his part, but to enable the said Roberts to procure its discount at a

Metcalf
vs.
Watkins.

rate beyond the legal interest. That it was so discounted by Watkins for thirteen per cent. and alleging *scienter*.

Second—The same facts without *scienter*.

On these pleas, there was replication, rejoinder, sur-rejoinder and issue. The pleadings all admit that the bill in controversy was drawn without consideration as between the drawer, payee and indorsers, and Roberts.

In the progress of this cause below, many exceptions were taken to the opinions of the court. The following, however, comprise the errors on which the cause was adjudicated in this court.

First.—The defendant moved the court to instruct the jury, that if from the evidence they believed the plaintiff Watkins was ignorant of the circumstances under which the bill in question was formed and indorsed, yet it was usurious and void. The court refused to give these instructions, but on the contrary charged the jury, that if they believed Watkins was ignorant of the circumstances attending the creation and indorsement of the bill, and unconcerned in its formation, then, though it was without consideration as between the parties to it, it was not usurious.

Second.—On the trial of the case, the court permitted the declarations of Roberts, the person for whose accommodation the bill was drawn, to go the jury as proper testimony.

The learned and elaborate opinion, delivered by the Chief Justice, contains such an explicit statement of this case, that it has been thought sufficient, to furnish the above brief history of the points involved in the decision. In justice, however to the able arguments of counsel in this important case, it may be well to state, that it appeared that Watkins, before discounting the bill in question, called on Metcalf to enquire of its genuineness, and was answered, "that it was all right." Metcalf averred, that this reply related solely to the execution of the bill. It was however, insisted on as evincing a fraudulent representation to Watkins.

McClung, for Plaintiff.

Metcalf
vs.
Watkins.

Hopkins, for the Defendant in error.

The evidence of what Roberts said when he sold the bill to Watkins, was competent. His statement is a part of the contract, and may be proved by the testimony of the same persons, who can prove any other part of the contract. His representation was a part of the inducement of Watkins to purchase the bill, and could be shewn by evidence from the same source, that the price, another part of the inducement, at which the bill was offered, could. Against Roberts, the purchaser could prove his representations, by any competent witness who heard them. Watkins acquired the bill upon a contract with Roberts, and had a right to prove it by any one who knew what the contract was. If the the purchaser had been informed by the seller, that the bill was an accommodation one, any one who heard it would have been competent to prove it. When one makes a contract, he does not rely for the evidence of it upon the other party, but upon disinterested persons.

If the purchase of a bill at a discount greater than the legal rate of interest, without a knowledge of its character, and with no intention to lend money, be constructive usury, the plea should consist of the facts only which constitute such usury—2 *Chit. Pl.* 498—*Note G.* 3 *Term Rep.* 299, 300. The pleas in this case aver, that the usury was intentional and corrupt—that the bill was made with the knowledge and by the request of Watkins, and with the purpose, by all the parties, to evade the statute against usury. As these facts were put in issue, the defence could not be sustained without evidence of their truth, and there was none such. The instruction of the court, that Watkins was entitled to a verdict, if Metcalf had failed to prove the facts he had put in issue, was correct.—*Harper* vs. *Cowan*, in this Court—*Gould's Pl.* 163, *Sec.* 186.

Metcalf
vs.
Watkins.

A part of the issue is, that the seller represented to the purchaser that the bill was founded upon a valuable consideration—that Metcalf was applied to before the purchase was made, to know if he had signed it—that he replied that he drew it and all was right—that these representations induced Watkins to purchase the bill. As these facts were in issue, Watkins had a right to prove them, and did so.—*Gould's Pl.* 163, *Sec.* 186, 411—*Sec.* 57, 413—*Sec.* 60—1 *Chit. Pl.* 605. The rejoinders to the replications, admit enough to secure to Watkins the judgment, which he obtained. They admit that Metcalf, upon the application stated in the replications, did give the information which has been referred to ; and if his pleas be true, that he fraudulently suppressed the truth, to induce Watkins to purchase the bill.—1 *Gallison's Reports,* 400.

To a plea of intentional usury in the creation of a bill filed against an innocent indorsee, it would be a good bar to the plea, to aver in the replication, that the indorsee applied, before he purchased it, to the drawer for information concerning it, or to know if his signature were genuine, who informed him that he drew it, and that it was all right—1 *Wash. Rep.* 296, 389, 390—*Ord on Usury,* 107, 108—*Note G.*— The same principle would make such a replication a good bar to a plea, that stated the bill was an accommodation one— was discounted at a rate greater than the legal rate of interest, and concluded that it was therefore, usurious. There is such a replication to each of the pleas in this case.

The *protestando* in the rejoinders is an admission that Roberts made the representations upon the sale of the bill, which are stated in the replications—*Gould's Pl.* 411, *Sec.* 57—413, *Sec.* 60—1 *Chitty's Pl.* 605. That he did so was proved by other evidence. It is stated in the pleas, that the drawer, indorsers and Roberts, intended, when the bill was made, that Roberts should sell the bill at a discount greater than the legal rate of interest. It thus appears there was a design common to them all, in the creation of the bill, that the

statute against usury, should, if it could by such a sale, be violated. As this was their common purpose, the statement made by Roberts, that the bill had been made upon a valuable consideration, binds them all, and precludes the defence that there was no consideration for the drawing and indorsing the bill.—2 *Starkie on Ev.* 44, 46—1 *Wash. Rep.* 296, 339.

Whether the sale of an accommodation bill at a discount greater than the legal rate of interest, to one ignorant of its character, be usurious or not, need not be settled in this case. The issues were not confined to the fact, whether the bill were of this character; they embraced other matters. If, as the pleas allege, the bill were drawn for the accommodation of Roberts, the proof shews that Watkins did not know it; and the fact admitted in the rejoinders, that Metcalf withheld the information of its character, when he had an opportunity to give it, fixes a fraud upon him. The fact which proves the fraud, being an admission upon the record, cannot be contradicted by other evidence, and entitles Watkins to the affirmance of his judgment, although this court may think, the county court erred in the instruction it gave to the jury, as to the law applicable to the purchase of an accommodation bill, by one ignorant of its character, at a discount greater than the legal rate of interest. The effect of a reversal, would be a new trial; but that is never granted in a case in which a like result would be inevitable, although error has been committed upon the trial.—2 *Johns. Rep.* 36—1 *Johns. Cases* 255—3 *Johns. Rep.* 239.

A Supreme Court will not reverse, although there be error, where the record shews the successful party is entitled to the judgment he has.—1 *Cranch*, 132—3 *Littell's Rep.* 15—2 *Peter's Rep.* 354—4 *Cowen's Rep.* 674, 680—1 *Gallison's Rep.* 400—5 *Amer. Dig.* 177.

The most credible evidence in the cause, shews the bill was drawn upon a valuable consideration. This evidence is afforded by the deed of trust made by Roberts for the benefit

Metcalf
vs.
Watkins

of Metcalf, which contains an acknowledgment that Metcalf had sold the bill to Roberts. From the deed, it appears that Metcalf drew and sold the bill to Roberts for $3500, to be paid by the latter to the former one month before the bill matured, and Metcalf secured interest to himself upon this sum from the time appointed for the payment of it by Roberts. If Metcalf were guilty of usury in that transaction, the bill which he drew and advanced for the grant and covenants in the deed, is valid and binds him. The holder is as well entitled to recover upon it, as Roberts would have been to hold the money, if money instead of the bill had been advanced upon that transaction.

If the instruction of the inferior court must be deemed a declaration of law, applicable to the case of a purchase of an accommodation bill, by one ignorant of its character, at a discount greater than the legal rate of interest, its correctness can be shewn. There cannot be usury without a loan of money, or the forbearance of a debt ; if therefore, the bill were fairly purchased, as all the evidence shews it was, by Watkins, without knowing it had been made for accommodation, the purchase was not usurious. The question of usury does not depend upon the rate, at which the bill was discounted, but upon the fact whether the purchaser intended to lend money or buy a bill.—2 *Munford's Rep.* 36—4 *Cowen's Rep.* 297—5 *Randolph's Rep.* 333—3 *Day's Rep.* 268—3 *Starkie on Ev.* 1521—*Hardin's Rep.* 81—8 *Term Rep.* 390—3 *McCord's Rep.* 385—5 *Randolph's Rep. Appendix* 622—*Ord on Usury* 107, 108, *Note* G. 109—2 *Mod. Rep.* 279.

A bill of exchange founded upon a valuable consideration, may be purchased at any rate of discount, however great, without violating any law—1 *Dallas Rep.* 217—2 *Hen. & Munf.* 14—2 *Dallas' Rep.* 92. Every bill imports a consideration, and in the hands of an innocent holder for a valuable consideration, the drawer cannot shew the want of consideration, fraud, or illegality of any kind, except usury or gaming. When the defence is usury in the sale of a bill, be-

Metcalf
vs
Watkins.

cause the purchase was made at a discount greater than the legal rate of interest, it does not conduce to prove the usury, to show that the bill was drawn for accommodation, unless it be proved also that the purchaser knew that fact—5 *Ran-dolph's Rep.* 417, 418—*Chitty on Bills*, 68, 81.

The purchaser of a bill founded upon a valuable consideration, cannot have his right to recover upon it impaired by proof of the discount at which he bought it; and the fair purchaser of an accommodation bill, who did not know its character, should be protected against the effect of such proof. If the bill be not drawn upon a gaming or usurious consideration, it imports a consideration which cannot be questioned, whilst such a purchaser is the holder. The case in this Court of *Faris & Powell* vs. *King*, did not require the court to decide whether the purchase of an accommodation bill or note, by one ignorant of its character, and at a discount greater than the legal rate of interest, was usurious. In that case no one could doubt from the evidence, but that the transaction was a cover for usury. The purchase of the note was a pretext merely. It was the object of the holder of the note to lend money, and he knew it had been made for accommodation, and to enable the person of whom he received it to borrow money. The authorities relied upon for the defendant in error, are founded in principle, from which the decisions upon this point to the contrary, derive no support.

The purchaser of a bill usurious in its concoction, if he had no notice of its character, can recover of his immediate indorser what he paid for the bill. Why? Because he did not participate in the guilt of the usury, and the contract on which he acquired it was legal. Upon that contract he can recover against him, who is a party to it; although he cannot recover against the drawer, because the contract on which it was drawn was usurious. As Watkins did not know the character of this bill, no one could deny his right to recover of Roberts what he paid him for the bill. There was no usurious contract before the bill was sold, because no one had.

Metcalf
vs.
Watkins.

given or received usury—no one had bound himself to pay, or promised to accept usury—no one had incurred the penalties of usury. That the contract on which the purchase was made, was legal, is demonstrated by the liability of Roberts, the only party to it, for the amount of the sale. As the contract of purchase is legal, not infected with usury, for if it were, there could be no recovery against Roberts, and no usury was committed before the sale, where can the alleged usury be found? or what can prevent a recovery against the drawer upon his bill, which was not drawn upon a gaming or usurious consideration. There cannot be a case of usury, in which, the parties to it may not be subjected to the penalties for that offence. Is Watkins liable to the penalty? He had no knowledge of the character of the bill; was informed and believed, that it was of a different character, and made a contract, which is legal, and binds Roberts to him for the amount he paid for the bill. As the contract is thus legal, it cannot be usurious. If Watkins did not agree to receive usury, the defendants did not agree to pay it. If it be a case of usury, it is the unprecedented one, in which, not one of the guilty has incurred the penalty of his crime. If at the time Watkins purchased this bill, he had bought by the same contract another at the same rate of discount, of which Roberts was the *bona fide* owner, the purchase of the second bill would be free from usury, and the title to the interest in it good against all the parties. Can any reason be given why the purchase of the second bill is legal, and that of the first usurious? They both formed the subject of one contract only. The purchaser knew as much of the consideration of one as he did of the other. He believed the seller was the *bona fide* owner of both.

A note made for accommodation, if sold for its full value, is valid in the hands of the holder, so is an accommodation bill of exchange discounted for its full value. There is no obligation in such instruments until they are discounted. The person then who is entrusted with the power to negoci-

ate them, is authorised by the drawer and indorsers to do an act to create a liability upon them ; before such act is done there is no liability on them ; he who has their authority to make the negociation, is their agent to make the contract which is to create their liability, and his representations are those of their agents, and they are bound by them. They put it into his power to make the representations. ‘The purchaser would not have lent money—he did not intend to do so—was not asked to do so—and did an act which is legal, because it would be so if the instrument had been made on a valuable consideration—that it had been made upon such a one he was told and believed, when he purchased it. His act is as guiltless, and secures to him the same right as if the bill had been drawn on a good consideration.

Metcalf<br>vs.<br>Watkins.

HUTCHISON, in reply.

To the last position taken to sustain the judgment, I will first reply ; because it seems the first presented by the record, and because it is not referable to any one of the matters put as error. It is urged, as the dernier point, that both special pleas aver intentional usury in Watkins ; that issue is taken on them ; that the evidence at farthest only shows constructive usury : and for this variance between the proof and allegation, judgment can never be otherwise than it was rendered : that material averments in a plea, when traversed, must be proved ; and though the court below may have erred in many particulars, yet, if on the whole, the proper result were attained, the judgment must be sustained. Authorities need not be cited to establish the rules asserted : they have been, and should ever be applied, when the aspects of the record they pre-suppose, do really appear.

But let the pleadings be inspected, and they will be found to present most plainly, the following matters for judicial action.

1. That the bill was drawn, indorsed, and delivered to Roberts, solely for his accommodation, and without considera-

tion to the drawer or either indorser, is alleged in both pleas, not denied in the replication and sur-rejoinder, and according to the text cited, *e contra,* stands admitted—*Gould,* 411. That Watkins gave to Roberts for the bill $3045 only, is asserted in the replication ; and being consistent with what is stated as to that in both pleas, cannot be recalled.

2. That the bill originates in a usurious agreement, between drawer, indorsers, and Roberts, to enable him to obtain upon it the $3045, is stated in both pleas, denied, re-asserted, and re-denied : but the first plea avers that this was at Watkins' request, and with his knowledge ; the second omits the request and knowledge ; the replication, taken as an answer to both pleas, denies such request and knowledge ; the rejoinder protests them ; the sur-rejoinder re-denies, and the *similiter* follows.   If the protestation as to request and knowledge, can apply to both pleas, the issue on both is the same, and that is upon what is called constructive and not intentional usury ; or if the protestation as to the *scienter* may be considered as following the second plea, in which *scienter* is not averred, then there is issue, on constructive usury upon the second plea, and on intentional usury upon the first.

3. The replication asserts, that application was made to Metcalf for information in general, concerning the bill, and that he answered *all was right;* the rejoinder denies such application, asserting that it was solely to know if he signed it, and that he answered he did ; the sur-rejoinder re asserts the matter as replied, and the *similiter* puts the matter replied and sur-rejoined, at issue.

4. The replication avers that Roberts represented—without stating to whom—that he was the fair owner of the bill for value ; and this, being perfectly immaterial, is put in protestation.

5. The replication avers that Watkins was the fair purchaser, without intent to violate the statute ; and this is at issue.   The pleadings therefore raise these questions.   Was intentional usury committed?   Was the bill void for construc-

Metcalf
vs.
Watkins.

tive usury ?   If otherwise usury might appear, yet was Watkins fraudulently induced to buy,  as good,  a tainted paper, and consequently, was he protected ?   The *ultima ratio* I am noticing, ·concedes hypothetically, that the evidence shows , construstive usury, but insists there is no issue as to such usury—so that, having shewn·that the latter branch of the position is untrue, the position itself utterly fails.  ,

The first and second exceptions, and the correspondent ·assignments of error, embrace the competency, as evidence for Watkins, of the *colloquia* between Roberts and Pleasants, between·Pleasants and Watkins, and between the trio, anterior to and pending the transfer of the bill.   Pleasants, the friend and agent of Watkins, was permitted to testify to all these, when there was nothing to show that the drawer or either indorser had authorised or induced them, or had the least knowledge or participation in them.

When I come to notice if intentional usury appeared, I will state the special *colloquia* proved by Pleasants.   It is sufficient here to mention, that the drift of the evidence seemed designed to manifest that Roberts, by fraud, might have induced Watkins to believe the bill substantial, and to form around him a sort of panoply, under which he might shave the bill with impunity..   There has been a vehement outcry about the iniquity of *convicting* the innocent money-dealer of usury as a crime, in the absence of intention to commit it— and that to do so is to subvert a fundamental dictate of natural justice.   I accept the principle, and admit that it either does or should pervade every branch of municipal law.   Apply it here.   The declaration or act of a party to the record may be proved against him; but the act or declaration of one, not a party, nor in privity with the party, cannot be proved, for it·is a rule of universal justice, that no man shall be precluded or prejudiced by the act or declaration of a stranger—, 3 *Starkie's Ev.* 1300.   Roberts was not a party to the record : he was not Metcalf's ancestor, nor lord of his fee, nor his lessor nor feoffor—neither was he his testator or intestate—

Metcalf
vs.
Watkins.

so that Metcalf was not in privity—2 *Thomas' Coke*, 506, Note 3.    Was he agent of the drawer ?    Agency is either by contract, express or implied, from a current of sanctioned acts, by which the principal confides to him, thus actually or constructively authorised, something to do for him, and to account.    It must concern the property of the principal, or of another, or of principal and agent, and cannot be the sole affair of the agent; for one cannot be employed to attend to his own business—1 *Livermore*, 2, 6.    The pleadings admit the bill was drawn, indorsed, and delivered, for Roberts' sole use, and without consideration; and if this could be contravened, the evidence does not contravene it.    The evidence is, that it was so drawn, indorsed and delivered—without any agreement, express or tacit, for the benefit of drawer or indorsers—without any interest to either, received, promised or expected—without any authority to Roberts, express or tacit—under his promise to pay the bill at its maturity, and to indemnify the drawer—and under confidence in those promises, and in his ability to redeem them.    Was not Roberts then plainly the principal ?    Had it not been ever held, that a drawer or indorser for another's accommodation, was surely of him accommodated ?    Did a jurist ever dream that such drawer or indorser should thus be transformed into a principal for him accommodated, and charged with his representations, whether true or false ?    The counsel for the appellee disclaims relying on the idea of agency—but the judge relied upon it, and we shall presently meet his new doctrine on that subject.    The reason given, why Roberts was not a competent witness for Watkins, is good—his interest was greater upon one tack than the other—the source of his testimony was polluted—and what then shall be said of the morality of repeating his declarations in court, to the prejudice of one party, and the benefit of the other ?    A vendee cannot have the benefit of the testimony of his vendor, nor indorsee that of his indorsor, to support the title passed to him.    The transferror is equally incompetent—and conse-

quently, his declarations are inadmissible—1 *Stewart*, 198. It is urged, however, that as Watkins derived title from Roberts, if the transfer from him had been written and attested, the witness could have proved the paper and the *res gesta*. Not so : the transfer from Roberts was no link in the chain of title—his name was not on the bill—Watkins claims under Ice. The facts of his discounting the bill with Roberts, and the delivery by Roberts, are admitted in the pleadings, and required no proof. If proof had been needed on that score, legal proof should have been furnished. The evidence of Roberts' declarations was not offered to prove the transfer, but to make out ostensibly a fraud practiced on Watkins, and consequently, his innocency—and what of that ? If Roberts defrauded him—if he relaxed the vigilance of the money-dealer, and confided in Roberts—let him take recourse upon him. There was another benefit to be derived by Watkins from the *colloquia*. In them he had opportunity, by his acts and words, to make out for himself the motives influencing him to purchase the bill ; and accordingly in the whole *colloquia*, he presents himself as a confiding purchaser ! The dialogues, however, will be put under the rules of *res inter alias*, and not be allowed to prevent another verdict.

It is asserted that Pleasants' evidence rested on the ground of a concert to defraud Watkins, and the text in 2 *Starkie's Ev.* 44, 46, is read to show the doctrine deemed applicable. The community of interest and confidence existing in a partnership, are not indeed pretended to have existed here ; but it is insisted there was a concerted scheme between Roberts and the drawer and indorsers, to obtain $3045 from Watkins ; and that according to the rule declared in the text, each conspirator must respond for and abide the consequences of the acts and declarations of his associates. The rule is, that the common interest and concerted design, must be first clearly established. Unfortunately for the argument, these were not only not proved—not intimated by the evidence—but every where strongly and indigdantly repelled. The

bills of exceptions that contain Pleasants' evidence, express-
ly declare there was no such proof; and the evidence subse-
quently received, does not only condemn the assumption, but
gives positive denial to every branch of it.   At the origin of
the bill, the drawer and indorsers were assured the arrange-
ment was already made to discount it—and when Pleasants
asked the drawer if he signed it, declaring in effect that that
was all the information Watkins wanted, what should he have
answered more than he did ?   He supposed of course, that
as the arrangement had been made with Watkins before the
bill originated, that he needed no information beyond that
sought.   He was relying on Roberts' promises to pay the
bill, and in the meantime to give indemnity; and it is most
unreasonable to suppose, that his mind was looking forward
to the defence he should make.   If, when the bill was pre-
sented, he *knew* that Watkins was about to purchase under
the influence of false representations, it would have been his
duty to have undeceived him : or if Watkins' friend had ask-
ed for the consideration of the bill, his authority to draw on
Beal, or if Beal had his funds—to these he would have been
bound to answer truly.   His answer was natural and unso-
phisticated—corresponding plainly with the statement he
made in court.   And what of the deed ?   It is said it admits
a debt due from Metcalf to Roberts—what debt ?   Why the
bill in question ; which Roberts, by the deed, says he received
as so much cash.   If then he did get the cash on it—it fol-
lows that Metcalf did not get it.   Then as to the interest to
be paid, which is called usurious—by the deed, the proper-
ty conveyed might be sold a month before the bill ma-
tured, to satisfy Metcalf the  $3500,  " with interest, if
any had accrued;" but as none  could have accrued,
none could have been claimed.   If Metcalf had *receiv-
ed* indemnity it would have been shewn.   The proposition
I am refuting then, is this, that he, for whose sole use a bill
is drawn, indorsed and delivered, may go into the money-
market and suppress as much truth, and utter as much false-

hood, as may be needful to satisfy the casuistry of the shaver, and vamp up a case of ignorance for him, and the fraud shall redound upon the drawer; the court may take the inquiry from the jury, and having adjudged that the fraud of the principal is the guilt of the surety, may admit hearsay evidence of the acts and declarations of that principal, to establish his fraud and transfix it upon the surety! This is the rule of civil conduct it is expected this court will apply for the protection of one, who has sought profit, by *cutting* the bill! *Cutting* is the technic of the art! When I am told that by a higher will than human, I am to answer for the sin of another, I say it is false; and when I witness an attempt to bring into the civil code the correlative principle of imputed fraud, I say it will not be done. On this score there can be no doubt. The admission of proof of Roberts' gratuitous and false assertions, tended urgently to fix the consequences of his fraud—if on scrutiny it shall seem a fraud—upon him, who was only a surety for him, confiding in his promises and his honesty—and hence it merits pointed reprehension.

The third exception is the exclusion of part of the statements of the drawer and indorsers, verified and offered as evidence under the statute. The substance of what was excluded is, that in drawing and indorsing, they did not intend to injure or defraud any one, but believed Roberts would suffer the discount, pay the bill, and be in fact the only one injured. An inconsistency here strikes the mind too vividly to escape remembrance. At the preceding moment hearsay of Roberts' falsehood was received to show Watkins' innocency, and impute the fraud to Metcalf—and now, when Metcalf and his co-sureties, thus assailed, and who were competent to testify as to their own acts, attempted to declare the motives and views that influenced them, they were denied the privilege. It is difficult to perceive why one, who is permitted to tell what he did, shall be prevented from giving the motive of the action, especially when that is sought to be impugned by the imputation of another's guilt. Because in

Metcalf
vs.
Watkins.

other lands and times, men have had more than property and life at stake—have had reputation at risk—and have been gagged and sacrificed—it could furnish no precedent here unless there had been an overruling necessity for the public good to put down the plea of usury, as at once infamous and hurtful. When a witness is deposing to the act of another, he may not give his opinion of the motive or object of the act, for as he cannot know it, his opinion can only be conjecture: the judge or the jury must infer the motive or object : but when the actor himself, to whom the motive and object must be as certainly known as the act itself, is deposing, the objection ceases, and his testimony as to both is equally credible. The language of this court, in 1 *Stewart*, 258, was disregarded by the judge below. Instead of acting on the principle "that the court could not indulge in speculation as to the credibility of the parties, nor say that if the plaintiff deny and exclude part of the evidence, the remainder, undenied, is unworthy of credit"—he judged of the credibility of the excluded evidence, and by excluding it declared it incredible. The matter was pertinent, and the more essential to justice, since by the introduction of Roberts' representations, the motive and object of the drawer and indorsers were sought to be, unjustly assailed. If Watkins had deigned to answer the statements, and to declare his innocency of motive, would or could that have been excluded? Could that have been pruned and curtailed to suit the notion and meet the credence of the judge—pruned and curtailed of what bore directly on the issue, as was done with the evidence offered in the defence ? Why was it done ? There is no conceivable good reason.

The fourth exception embraces the charge of the court : that if two or more concert to make a note to raise money, and one of them be authorised to discount it at an illegal rate, and pass it at such discount to one, ignorant of its character, the latter is not affected by the defence of usury : usury is a crime, and no one can be thus converted into a criminal,

This charge was abstract, unjust, injurious, and sophistical. Each juror was thus told that the judge believed there had been a concerted scheme between Roberts and the drawer and indorsers, to obtain the money on the bill for their common benefit; that Roberts only acted as the proctor of the company, and that the ignorant and confiding Watkins was circumvented! We have shown—as the record will ever show—that no one constituent of such concerted scheme, common interest, and agency, was proved, and every imputation of that sort distinctly denied. An instruction then was delivered, in reference to a state of facts, wholly assumed, in deference to the supposed better judgment of the court, adopted the facts thus assumed, as the legal results of the evidence, and felt bound to apply the principle declared. Nothing was left for them to determine. Could any thing be more certainly unjust and injurious? Can such administration of justice be endured? But usury was a crime, and no one could thus be converted into a criminal! That was the bug-bear! Did not every lawyer know, that to convict of usury as a crime, the intent to violate the statute must appear, and the illegal gain must be received? Was it not known, that if the bill should be vacated, a recovery could not be had, and its amount could not be received? And if the innocent Watkins should not receive his per cent. he could never be prosecuted *qui tam* or *criminaliter*? With the decisions of this court before him, the judge seemed unable to distinguish this proceeding, in which, for the enforcement of the statute, a security for a usurious loan might be vacated without positive proof of a volition to violate it—and mark its manifest difference from a prosecution to punish the usurer. He in effect, appealed to the humanity of the jury—warning them not to convict the innocent of the foul offence of usury, as if he stood indicted for wilfully receiving a corrupt profit, and as if too, the judge felt an uncommon abhorrence for that crime! Yet was Watkins ignorant of the character of the bill? Was he really deceived by Roberts' far-

10

rago about it ?  The preliminary occurred between Roberts and Pleasants.  Pleasants, though his house had been in the habit of discounting like bills on New-Orleans at 13 per cent. was not then in funds, but had a friend who was—that was to say, Dr. Watkins.

Something was said about a sale to Holding, to procure the bill; and it is a curious circumstance, that if it was to be procured by a consideration to Holding, the bill should be written during the same interview for the signature of Metcalf, Smith and Ice, as if there had been a trade between Metcalf and Roberts, which the bill would precisely fit.  It is not less curious, that the sum to be given for the bill, was now arranged with as much confidence as if Watkins had been consulted.  From what occurred at this interview, did or could Pleasants have believed that the paper he prepared was to be the evidence of Metcalf's debt to Roberts for his land and negroes?  It was quite impossible.  This preliminary was faithfully imparted to Watkins, as was all else that occurred in his absence; and what could he think of it?  Could he see any thing of a real transaction in it?  That was alike impossible.  Whether Roberts conferred with Watkins or not, is not testified, but is left to be collected from the drama.  Watkins at the next appearance of Roberts was still behind the screen.  Pleasants receives him—the bill, as signed, is presented in triumph.  " This is a real affair—none of your bills to raise money."  The bill is carried to Watkins, and all he now wants to know, is, that Metcalf signed it.  Inquiry is directed solely to that point, and of course no farther questions were to be put to Metcalf.  Watkins then comes forward with the exact sum to fill the preliminary.  The farce, acted before Pleasants, may have deceived him, but did it deceive Watkins?  No one can believe it did.  It had become important, since the Shelby case, to know something about the consideration, and not merely to seem to be deceived.  Yet were the particulars about the consideration ask-

Metcalf
vs.
Watkins.

ed even of Roberts ? Was Metcalf questioned concerning it ? Was he asked if he had purchased Roberts' land and negroes, or if he had authority to draw on Orleans, or had funds with the drawer? The drawer and indorsers were the men to be charged, and the men to be consulted, but the most scrupulous nicety was observed, to avoid obtaining from either, one jot of information, except the fact of the drawer's signature. If we desire the truth, and exert dispassionate reason, we cannot be deceived by this farce. As Watkins was not to have any information as to the character of the bill, that might be proved, so he was not to be put on his oath about it. The statements of the drawer and indorsers, after due curtailment, were submitted for his denial. It is said, however, that they contained nothing, of which it was pretended he had no knowledge, so that he had nothing to deny. But the *scienter* as to him was put at issue by the first plea ; and the statements, verified and submitted, presented the startling charge, that the arrangement had been made to discount the bill before it was drawn, as Roberts had declared; and though Roberts did not state with whom it was made, yet Pleasants had just proved it had been so made by him for Watkins. If therefore, Watkins was a fair purchaser, he had a fair opportunity of asserting the truth on his oath : and why did he not clear up the doubts thus raised ? Because he could not swear what his counsel had pleaded ; and now the song about ignorance and innocence, deceived and abused, is not to be heard. It is quite plain that the concoction of the bill was known to Watkins ; and we perceive why it was the negociation was conducted by Pleasants, and the *colloquia* interposed, and why no one question as to the concoction of the bill was put, and a profound indifference on that score manifested ; and looking at the transaction from first to last, lifting the mask and the drapery, hung over and around it, we see who were the chief actors—Roberts to get the money, and Watkins to shield his profit, if possible, under the guise of a fraud practised ! No dry exchange in Britain or the state of York, was

Metcalf
vs.
Watkins.

ever more ingeniously continued to elude detection ; and no race-horse bill of Kentucky, better grown, and groomed, and mounted. It was cut at 13 per cent. discount, equivalent to 17 per cent. interest, per annum, and the 10 per cent. damages of protest, sure to be superadded, made 27 per cent.— From this view of the instruction of the judge, now considered, it may be asked with confidence, was it not indeed abstract, unjust, and injurious, and fraught with sophistry?— 2 *Des.* 336—*Gilmer's R.* 87, 88—5 *Rand.* 339, 340, 370.

The fifth and eighth exceptions may be examined together. The jury were instructed, that if the drawer and indorsers delivered the bill to to Roberts to be sold, they made him their agent in the disposition of it, and were bound by his acts and representations therein. It has already been shown that there was not an iota of testimony to raise even suspicion that the drawers or indorsers had, or were to have any interest in the product of the bill: therefore, to assume entirely, and in direct opposition to the positive proof to the contrary, that they were interested, was to mislead the jury, and make up a baseless verdict for them. Having made that step—having raised for them a concert and common interest, it would be natural for them to adopt the judge's conclusion, that Roberts was the agent of the drawer and indorsers, and that they might be inculpated and charged with his acts and representations. Wretched in the extreme shall be the course of justice, if this mode of instructing our juries shall be tolerated·

The instruction sought, as stated in the eighth exception, presented the evidence in a condensed form to the judge, admonishing him to give at least a hypothetical charge on what was sworn, and to have the truth or falsehood of the matters testified, to be weighed by the jury. How could he refuse a charge predicated palpably upon the testimony, and upon nothing extraneous or not testified? Yet he refused it, and to give to his own estimate of the evidence the oracular force of the judgment seat, he repeated as a substitute, the instruction already given and contained in the fourth exception. If

the instruction asked had been given, the *colloquia* detailed by Pleasants, must have been excluded: but it seemed proper to the court below to retain them ; and moreover to enforce the following new doctrine, that Metcalf, Smith and Ice, by drawing and indorsing solely for Roberts' use—without consideration to them or either, or benefit received, promised, or expected—and by delivering the bill to Roberts without any authority to him, tacit or express, other than what was imparted by the mere delivery—they did constitute him their agent—became his co-conspirators, and the truth he suppressed, and the falsehood he uttered, was their fraud !

We come now to the questions arising out of the sixth and ninth exceptions. The chief one is, whether the doctrine declared by this court—called by the appellee's counsel, constructive usury—shall be overruled—as it was disregarded by the court below ; and whether the judgment, obtained upon the enforcement of the converse of the principles settled, shall be sustained. The doctrine declared in King's case, July 1837—1 *Stewart*, 353—is, that a note or bill, usurious in its formation, remains tainted throughout its negociation—that if a note or bill be drawn to be discounted at usurious interest, and be indorsed for the accommodation of the maker or drawer, it is void at its inception, and it is immaterial whether the buyer of it, at an illegal rate, knew of its character or not. The CHIEF-JUSTICE and Judge WHITE concurred in the opinion delivered by Judge SAFFOLD. Judge CRENSHAW dissented, believing the arguments were sophistical, and the authorities misapplied, but not advancing his reasons, or any criticism upon the authorities reviewed. I remember the long day, when I contended feebly and singly against MEADE and DARTON. I relied on the decisions in New-York, and they received from my opponents the severest scrutiny. The note was for $500, by Faris as principal, and Powell as surety, payable to Johnson, but without consideration, and solely to enable Johnson, by indorsing it to King, to get $400—not for himself, but for Faris. King de-

Metcalf
vs.
Watkins

nied on oath, all knowledge of the origin or object of the note, and claimed the protection due to an innocent fair purchaser. Faris and Powell therefore raised the defence of usury, under circumstances greatly more unfavorable than exists in the case before us ; for here Metcalf was not to receive, and did not receive a cent of the product—stood solely as Roberts' surety—with a deed for his indemnity that has yielded him nothing, and Watkins, instead of denying on oath the *scienter* charged, rested upon the averments in the pleadings. But it is contended that the evidence in the Shelby case showed clearly knowledge in King ; and the court, by assuming his denial of it sufficient, mistook the import of the evidence, and applied principles to a case not before it, and hence the decision amounted only to a dictum.    The court had the record before them, with all its minutia, much of which may not appear in the report—and though it was contended that King's denial of knowledge was not to be credited, three of the court pronounced it a sufficient denial to to put away the proposed proof of his knowledge.    The judge, whose views of the doctrines involved agree with those of the present appellee's counsel, declared that King's denial was not only perfect but credible.    Was the court then, or the counsel now, mistaken as to the case decided ?    There was a solemn judgment upon an appropriate case, and one greatly more unfavorable than the present for the allowance of the defence. In *Thompson* vs. *Jones*, July 1828, 1 *Stewart*, 556—the doctrines thus declared were sanctioned and illustrated.    It is there repeated, " that if a security be made to raise money at a usurious rate, having never been negociated in the course of business, and be discounted at that rate, though by one ignorant of the circumstances, it is void.    If it be prepared to procure money at usurious discount, no matter on what specious pretext, what the position, or how many names appear on it, and it be negociated pursuant to the design, it is void. No cunning or artifice in the management of the supposed debtors, nor feigned ignorance in the person discounting it

can vary the case. If he, to whom it is offered for discount, be in fact ignorant of the circumstances under which it was created, he must ascertain at his peril, that it has acquired validity by having been executed on a legal consideration— or if it prove otherwise, he can only expect indemnity from him of whom he received it." Were these too mere dicta? In *Watkins* vs. *Watkins, July* 1830, 2 *Stewart*, 435, it was held, that if the denial of the purchaser, of his knowledge of the concoction of the note were deemed sufficient to exclude the offered proof, it would in every case exclude the evidence of the borrower, as in every instance a third man might be interposed to be ignorant—and the Shelby case was again sanctioned. These were the adjudications, which were presented to the court below to be applied; and the Shelby case, being the leading one, and directly in point, was urged particularly; but the doctrines were denied and rejected in each and all the forms in which they were pressed, as the highest *criteria* for the court's action. It is now argued, that the *dictum* in the Shelby case, was predicated upon the doctrines reported in *Johnson;* and that in each instance, in which constructive usury was uttered; the transaction was one of palpable intentional usury—save only that of Munn, and there, though he discounted the bill ignorantly, it was found to have been a good bill. In *Taylor* vs. *Bruce, Gilmer* 42, Judge *Roane* reviewed these cases, giving an estimate of them very different from that of the appellee's counsel; concurred in the principles deduced; and lest they might be distrusted as *northern lights,* appealed to those of Westminster as emitting kindred beams. In *Whitworth* vs. *Adams,* 5 *Rand.* 344, &c. the Judges, *Carr* and *Green,* present luminous and more enlarged examinations of the cases, as well in England and New-York, as in Virginia; and concur with *Roane* in the result, which this court attained upon the New-York decisions alone. In *Taylor* vs. *Bruce,* the shaver prevailed on the opinions of *Coalter* and *Brooke* against that of *Roane*—and in *Whitworth* vs. *Adams,* the judgment of *Coal-*

Metcalf<br>vs.<br>Watkins.

Metcalf
vs.
Watkins.

ter, *Brooks* and *Cabell* outnumbered that of *Carr* and *Greene*; so that a covert is formed in Virginia for us by accident— but so far as the decisions there can afford authority at read, it must depend upon the superior force of the intelligence and reasoning of the three on the one side, or of the trio on the other. In view of the honor due to the genius, learning and literature of my native state, I prefer instruction in jurisprudence from *Roane*, *Carr* and *Greene*. North-Carolina has adopted their view, and proceeds with England, New-York and Alabama—*Ruffin* vs. *Armstrong*, 2 *Hawks*, 411—*Wilkes* vs. *Coffield*, 3 *id.* 28. I will not attempt to apply the New-York cases, much less those of England, after the reviews of them by the dissenting Virginia Judges; but will only make a passing remark upon the former. In *Jones* vs. *Hake*, 2 *J. C.* 60, Haskin was the operator and took the note, as Watkins did here, without inquiry, and it was held he did so at his peril. *Wilkie* vs. *Roosevelt*, 3 *J. C.* 66, 212, was twice heard, and two juries were severely reprehended for giving verdicts against the law and the evidence, upon the new theory that questioned the policy of the statute: Goodrich, who cut the note, acted with the caution of Haskin—asked no questions. *Munn's* case, 15 *J.* 44, is the one in which it is admitted by the present appellee's counsel, that Munn, who discounted the bill was ignorant. Ketchum was the name put forward to get the money, and wisely got Franklin, who knew less than himself, to obtain it. Substantially all the points, now made e *contra*, were there urged with great force, but overruled. When *Bennett* vs. *Smith*, 15 *J.* 355, was elaborating, it behooved Shylock to patch up a consideration, in order to seem to be within the rules prescribed. So that when Humphreys was asked for money, he replied, " If you have *good* notes, I will purchase." When put to his oath he swore ignorance. It would not do. Then came *Sowel* vs. *Waters*, 17 *J.* 176, where the transaction was thought to be disguised in the confusion of names and transfers; and lastly, the device in 20 *J.* 288, of agreeing to make a note as on the purchase of a spe-

cific article from him fixed on to be the payee. It was made, as if the article had been received, and without showing it to the payee or obtaining his consent, was discounted for the benefit of the maker. We in Madison, so long growing wise in the science, can invent a mode of purchase far more nice than that last named, or any reported. In small operations we have the expedient of a note for cotton estimated at half its usual value; and in larger dealings we disdain to rely on racer of Kentucky, but contrive to have the shaver not only innocent but defrauded! We can have the actors so arrang- ed, and the witnesses so circumstanced, that the whole affair can be represented over again in the tribunal, without de- parting a jot from the truth. Let the borrower make the representations to constitute the fraud; the witness, hear- ing, can only tell what he hears; the lender can be too sim- ple to suspect, and if he plead ignorance, being able thus to prove it, there is no occasion for his oath to establish it.

The counsel for the appellee, as if unwilling that this mas- ter-piece of skill shall be penetrated or questioned, has ex- plored the sources of the British law on the subject of usury, and gleaned from the American decisions and the two Virginia cases whatever principle or analogy could be found seeming- ly calculated to overturn, what to him appears a dangerous doctrine. Thus it is insisted, that to constitute usury, there must be an actual loan or forbearance; that there must be corruption of intention, a consciousness, at least of stipulating on such loan or forbearance, excessive interest; and that in this there must be *aggregatio mentis*. It is true, there must be a loan or forbearance; but such have been the shifts and contrivances to disguise, what have been in substance usuri- ous loans or forbearances, that according to the current of decision, as well as the language of the statute, we must dis- regard the name and color of the transaction, and unveil the intrinsic motive and object of it, and hence the term construc- tive is applied, to what is in effect a loan or forbearance, but whose ostensible name and dress are otherwise. The cases

11

on this head are noticed in the dissenting opinions in the two Virginia cases mentioned. *Hansbro* vs. *Baylor*, 2 *Munf.* 36, affords no illustration. There was a bill charging usury and praying a discovery of it—the answer denied the usury, and averred that the affair was the purchase of a bond that was valid. The proof supported the answer, and it did not appear that the bond was usuriously concocted. The meagre case of *Shipwith* v. *Gibson*—4 *H. & M.* 490—was where there was sheerly an actual sale of stock at a discount, and nothing to denote an intended loan : it is in fact, the mere certificate of the chancellor, that such was the transaction. Then as to the corruption of motive, and the *aggregatio mentis* : The word *corrupt*, was used in the statute of *Henry*, but that was solely for the punishment of the usurer *criminaliter*. The decisions upon it properly required the intention to appear. The statute of *Elizabeth* employed the same term in reference to agreements, securities, &c. to be vacated for usury ; and the decisions upon it conformed to those upon the preceding. The statute of *James* used the term in the penal, but omitted it in the civil clause. Hence, afterward, it was at first debateable whether in a question of usury *civiliter*, an intention to violate the statute must be shown ; but the court, perceiving that if this should be required, the statute would in every instance be evaded, held, that the attribute *corrupt*, in referrence to an agreement or security, impeached for usury, should be considered as a word of mere form, and finally established broadly, the doctrine of constructive usury—*Gilmer* 94—5 *Rand.* 349 to 352—360, 363. *Smith* vs. *Beach*, 3 *Day*, 268, was on a note made between the parties themselves, in which it was necessary to show an intention to take the excess, to create usury ; but the excess occurred by miscalculation and clear mistake. *Jackson* vs. *Holden*, 4 *Cowen*, 279, was cited to show that the decisions reported in *Johnson*, were there overruled. It was attempted to impeach a mortgage for usury as against a purchaser under it without notice, and that was not permitted ; but the court expressly a-

void disturbing the doctrine settled in regard to notes and <span>Metcalf<br>vs.<br>Watkins.</span>
bills. This is no more than a repetition of the principle held
in *Jackson* vs. *Henry*, 10 *J.* 196.

It is conceded, that if an instrument be once tainted, it can
never be purified, and though purchased by one who is igno-
rant and innocent, and gives full value, it remains void in his
hands. The authority of *Winton* vs. *Sardler*, 3 *J.* 193, 194—
*Jackson* vs. *Henry*, 10 *J.* 196—*Thomson* vs. *Berry & Van
Buren*, 3 *J. C. R.* 395, is therefore, not to be questioned.
These and the like cases, it is said, proceed on the ground
that usury polluted the paper at its inception, and being cer-
tainly void as between the parties making it, like a gaming
note, could not be purified by negotiation. This, it is argued,
is the distinction that should have been taken in the cases re-
ported in *Johnson*, and others of like character, when con-
structive usury was found. And what is the difference in
principle ? Take the bill in question for example. It was
made solely to enable Roberts to obtain money at usurious
discount. Thus far the intent was apparent ; and though,
as between the drawer, indorsers, drawee and Roberts, it
could not, because of that intention, be vacated for usury, yet,
as between them, it was void. If it had been negotiated for
full value, it would have been purified, and put on the footing
of accommodation paper. But the object was otherwise, and
it was illegal, and was consummated by the discounting. If
paper thus baseless, whose object is to obtain money at a sa-
crifice, were to become valid, no matter at what illegal rate
discounted, upon the pretext of purchase without notice, it is
plain the statute would be universally evaded, and become a
dead letter—for notice would never be proved. Hence the
necessity and propriety of putting the real or pretended pur-
chaser upon inquiry. There is no hardship in that. He is
not constrained to seek exorbitant profit, and when the law
is declared he can conform to it. Two cases are put—a bill
that is valid, and *one of your bills to raise money*, are suppos-
ed to be presented to the operator at the same time, and cut

Metcalf
vs.
Watkins.

at the like ratio, with equal ignorance and innocence ; and it is asked, if it be not absurd as well unjust to allow recovery on the one, and to vacate the other ? Not so : the law admonished him to enquire, and he did not—therefore, good luck to him on the good bill, and on the other *caveat emptor*. Let two other examples be considered. Two bills are presented—one already void for usury, and another only concocted—for the void bill he gives full value, and for the concocted one, he gives less 27 per cent. discount. Here, according to the argument, he must lose that for which he gave full value, and triumph upon that he shaved. Such is the consistency of the doctrine invoked. To say too, that he, who is utterly ignorant of the taint on the paper he receives, and for which he gives full value, shall be the victim of the statute, and at the same time protect him, who cuts paper, whose vocation it is to shave, would present the morality of the law in an aspect worse than doubtful.

Authorities are adduced to sustain the position, that where he who is to be charged upon the usurious security, has induced one without notice to purchase it as a good instrument, or where a new note is given to the innocent purchaser of the original, the defence shall not prevail—8 *T. R.* 390—1 *Wash.* 296, 389, are cited—and it is contended that when Metcalf was asked as to his signature, and answered as to that only, he committed a fraud, by concealing the circumstances at the inception of the bill ; by his silence induced the belief that it was valid. It may be safely conceded, that it is in the power of one who has stipulated usury, to waive the defence the statute allows, in favor of one who is not participant in the intended violation ; and that one, who has given a security, which he may avoid for gaming or usury, may preclude himself from making the defence, by falsely and fraudulently representing to a third person, that it is good and valid, and inducing him to purchase or discount it. So too, if I hear a treaty between two others for the purchase of land or other property, to which I have a paramount claim ; as if

Metcalf<br>vs.<br>Watkins.

I attest the deed between them, knowing it is for the property I claim, and do not declare my title, I am precluded or postponed. All these principles are good. So here, if Metcalf had known or believed that Watkins was about to be deceived in the purchase of the bill, and that it was presented to him for information in general concerning its consideration and object, as well as genuineness, he should have spoken out explicitly and truly ; but, as already shown, he was under the belief that the circumstances of its concoction were as well known to Watkins as himself ; that he believed the bill would be duly paid, and that no question would arise ; and that hence, being only asked as to his name, neither reason nor justice required him to answer farther.

In conclusion, the error presented by the first exception, is only surpassed by that set forth in the second, and so throughout to the ninth, each rising, so to speak, into enormity, until in the last, the decisions of this court, which are rendered the imperative rules of action for the inferior tribunals, were openly contemned. It cannot be doubtful, therefore, that the error assigned on each exception will be sustained, and the judgment on each reversed.

To know whether the mercantile custom, intimated by Pleasants, can mature into legitimate usage of trade, by which a dry exchange upon New-Orleans from North Alabama at 16 1-2 per cent. discount, in prospect of ten more for protest, shall be sanctioned to the extension of the credit system among merchants and planters, I refer to the splendid illucidation of Chancellor *Kent,* in *Dunham* vs. *Day,* 16 *J.* 367.

Mr. Chief Justice LIPSCOMB delivered the opinion of the Court.

In this case, suit was instituted in the County Court of Madison county, by Watkins, as holder of a bill of exchange drawn by Metcalf on Beal, of New-Orleans, in favor of Smith, and indorsed by Smith to Ice, and by Ice to Watkins. The

Metcalf
vs.
Watkins

defendant below, pleaded two pleas setting up the defence of usury. The first, alleging, that the bill was drawn and indorsed without any consideration, but solely for the accommodation of one Roberts, to. enable him to procure an advance on it at the rate of thirteen per cent. discount—and that Roberts sold it to Watkins at that discount—also, that the object for which the bill was made, was known to Watkins. The second plea contains the same matter in substance, but without the scienter. The replication denies all knowledge of the bill being drawn for the purpose stated in the pleas, but avers, that the plaintiff Watkins believed it was for a fair and bona fide consideration—that before he advanced the money to Roberts on the bill, as stated in the plea, and previous to purchasing the bill, the defendant Metcalf, was applied to for information concerning it, and he had affirmed that the bill was all right—that he, Watkins, was induced by these representations, to purchase the said bill for a valuable consideration, to-wit, the sum stated in defendant's plea. This replication, by consent, was filed to both pleas of usury. The defendant rejoined, denying with a protestation the truth of the replication, and averring the truth of the pleas—that when Metcalf was asked for information as to the bill, that it was only whether he had executed or drawn it, and to such inquiry he replied, that he had executed or drawn the bill. The sur-rejoinder avers the truth of the replication, and denies the rejoinder.

On issue on these pleadings, there was a verdict for the plaintiff below. On the trial, several exceptions were taken to the opinions of the court, on charges given to the jury— and on the refusal to give such as were prayed for by the defendant's counsel.

As the points which follow, embrace, as it is believed, every important feature of the cause, we shall confine our examination to them.

" The defendant moved the court to instruct the jury, that if they believed from the evidence that the bill sued on, was

drawn and indorsed, as the defendant and indorsers, Smith and Ice, in their statement declare, and that the same was subsequently passed by the said Roberts to the plaintiff, at a discount of 13˙ per cent. from its date to its maturity ; and also, that the manner and circumstances of such transfer, and the transfer itself were not within the knowledge, concurrence or privity of the defendant ; then the bill was and is usurious, and void as against the defendant ; and the plaintiff cannot recover. But the instruction so sought, the court refused to give, as the same was asked ; but in lieu thereof, instructed the jury, that if they believed the plaintiff was totally ignorant of the circumstances attending the drawing and indorsing said bill, and wholly unconcerned in its origin, then though it was without consideration as between the parties to it, it was not usurious, and the defendant could not defeat the recovery of the plaintiff, on the ground of usury."

The question involved in this case is not new. It was fully embraced in the opinion of the court, in the case of *Faris & Powell* vs. *King*,[a] decided by the Supreme Court of the State, when under the old organization. The judges who then constituted the court, were CRENSHAW, WHITE, SAFFOLD and MYSELF. Judge SAFFOLD delivered the opinion of the majority of the court, deciding that the case was within the statute of usury. Judge WHITE and MYSELF concurred— Judge CRENSHAW dissented. As the court trying this case is now composed of only Judge SAFFOLD and MYSELF, it might well have been considered by us as "*res adjudicata*"— but the importance of the question, coupled with the facts that one of the Judges then dissented, and that the Virginia cases had not been commented on by the counsel, nor noticed by us in the case cited, induce us to look on the question as fully open in this case. We shall therefore enter into the investigation as though it had never before been decided by us.

The first section of our act against usury provides, " that no person or persons shall upon any contract whatever, take directly or indirectly, for the loan of any money, wares, mer-

Metcalf
vs.
Watkins.

[a] 1 Stew. 255

chandize, bonds, notes of hand, or other commodities whatso-ever, above the value of eight dollars for the forbearance of one hundred dollars for one year, and after that rate for a greater or less sum, or for a longer or shorter time ; and all bonds, contracts, covenants, conveyances or assurances, here-after to be made for payment of money, or delivery of any money, goods, wares, or merchandize, so to be lent, on which a higher rate of interest is received or taken than is hereby allowed, shall be utterly void and of no effect."

The proviso to the 4th section provides, that " this act shall not be so construed as to prohibit the sale of any bond or bonds which may have been given fairly and *bona fide*, and not given for the purpose of evading the provisions of this act." 

We shall not step aside to eulogise, nor to deprecate, the influence of usury laws in general, but content ourselves with arriving at a satisfactory construction of our own, on the sub-ject. It has been said that this law is penal, and requires a rigid construction—that it should not be brought to bear on any transaction not clearly within its letter. It seems to me that the proposition may be true or false, according to the subject matter on which it is to operate. When operating on the contract or the security taken, it is not strictly speaking, punitive in its character, and we should so construe it as to repress the great evil the legislature had in view in its enact-ment. But when the punishment of the person who has com-mitted usury, is sought, according to the benignant principle which pervades our criminal jurisprudence, it should be con-strued in all cases of doubt and uncertainty in favor of the ac-cused. This distinction between usury *civiliter* and usury *criminaliter*, seems to have been recognised by the legislature in the enactment of our usury law—the first section of which operates on the contract and such securities as may be taken for usury, and omits the word " corrupt." The second sec-tion directs in what manner those who have taken or accept-ed a greater than the legal rate of interest, shall be proceeded

against, and employs the word "corrupt" as an adjunct to the bargain for the loan, &c. Since the statute of Henry VIII, down to our own times, the authority of the highest judicial precedent, has urged such a construction of statutes for the prevention of usury, as to enable the courts to ferret out usury, no matter with what shift or device the invention or cunning of man might clothe it. The great and leading object being to detect the offence by whatever name it may be called, the statutes of most of the states on this subject, are similar in their terms, however different they may be in prescribing the consequences of such usury. Our statute excepting bonds fairly and *bona fide* made and sold, from the operation of the law, is peculiar. I am not prepared, however, to say that this exception would not have been implied, if it had not been expressed. Its insertion in the act will, however, give rise to another question—that is, whether as bonds alone have been excepted by the statute, this will not exclude notes and bills—" *Expressio unius Exclusio alterius.*" As this point however was not urged in the argument, I shall avoid expressing my opinion as to the effect of the proviso in the 4th section, but consider it as though bills and notes were included, or the proviso omitted. In *Jones* vs. *Hake*,[a] one Watkins made a note to Hake, which note was indorsed to him and others without any consideration, and for the accommodation of Watkins merely; it was then delivered to Hake as a broker, who procured it to be discounted by Herriman at a usurious interest. It afterwards came into the hands of Jones, an innocent holder. It was decided, that although Watkins and Herriman were unknown to each other, it was to be considered as a contract immediately between them. This case in some of its features, presents a striking analogy to the one before us. The purchaser or holder of the bill stood in the same attitude of a purchaser without notice, and there was no privity between him and the maker or endorsers—consequently there could have been no corrupt agree-

Metcalf
vs.
Watkins.

[a] 2 John Cas] 60.

12

ment on his part, to commit usury. This case was recog-
nised as good authority in *Wilkins* vs. *Roosevelt*,[a] and again
in the same book,[b] on an application for a new trial. The
case of *Jackson* vs. *Henry*,[c] is not believed to have much bear-
ing on the case before us. In that case there was a mort-
gage to secure the usurious consideration. This mortgage
was foreclosed, and the property sold under the decree of the
court, pursuant to the statute of the state. No defence of
usury was set up against the mortgage in the process for
foreclosure. The purchaser bought at public sale, under the
direction of the court, and was ignorant of the original consi-
deration between the mortgagor and the mortgagee. The
defence was never set up until the suit was brought to reco-
ver possession from the mortgagee, and it was then held by
the court, to be unavailable. Judge *Kent* in his opinion, ac-
knowledges however, that this case is bottomed on the sta-
tute of the State of New-York, and that statute expressly pro-
vides, that the sale of the mortgaged premises when so made
shall bar all equity of redemption. He too, recognises the
doctrine, that this favor or indulgence is not extended to an
innocent purchaser, when the suit is on the usurious instru-
ment, and refers to *Low* vs. *Waller*,[d] and *Brown* vs. *Bamp-
ton*.[e]

In the case of *Moore* v. *The President and Directors of the Com-
mission Co*.[f] it is held, that where a bill or note is valid as be-
tween the drawer or maker, and the payee, so that the latter
can maintain an action upon it against the former, it is valid
in the hands of an indorsee, who has discounted it at a higher
rate than the legal interest, and he may recover the full amount
of the bill or note against the maker or acceptor. It is fur-
ther holden in the same case, that a bill or note drawn for
the purpose of being discounted at a usurious rate of inter-
est, and indorsed for the accommodation of the maker or
drawer, is void in its original formation.

The case of *Dunham* vs. *Guild*[g] is not believed to have any
particular bearing on the question of an innocent purchaser

of a bill, drawn for the purpose of raising money at a usurious rate of interest; but as it is believed to be important, and in point, on a question raised and discussed, by the counsel for the defendant in error, it may as well be noticed here. It was contended that Watkins took and received, or contracted for, no greater discount on the bill purchased by him from Roberts, than the customary exchange between Huntsville and New Orleans. In the case just cited from 16 *Johnson,* the plaintiff offered to show on the trial, that the charge of a commission of two and a half per cent. on the exchange of notes, was within the understanding, usage and custom of merchants. The evidence was overruled as immaterial and useless. This was assigned for error. Chancellor *Kent* says, " that the rejection of this testimony was right; is a point clear and self-evident." He refers to the opinion of Lord Chancellor *Loughborough,* in the ex parte case of *Aynesworth,*[a] when his Lordship said, " that the custom of a trade to take a discount above five per cent. (or the legal rate of interest in England) cannot authorise a greater demand than five per cent." The Chancellor proceeds, that " it is perfectly idle to talk of a custom of merchants to take a commission above the legal rate of interest, on the exchange of notes. The custom of merchants is not applicable to such a case." It is not a matter of trade and commerce within the meaning of the law merchant; and if there was such a local usage in New-York, it would be null and void, and could not be set up as a cover or pretext to trample down the law of the land. The money lenders throughout the country might as well set up a practice of their own, and then plead it in bar of the statute. In the case of *Powell* vs. *Waters,*[b] Chief-Justice *Spencer* refers to the doctrine in the case of *Mun* vs. *The Commission Company,*[c] as settled law—that if the note or bill could not support an action, as between the original parties, before it had been sold, then if it is sold at a rate higher than the legal interest, it will be usury. It may be now considered as the settled doctrine in the State of New-York, that if the

[a] 4 Ves. 678.

[b] 17 John. 179

[c] 15 John. 55.

Metcalf
vs.
Watkins.

note or bill was made for accommodation only, and nothing paid for it until it was discounted, at a discount greater than the legal rate of interest, it would be usury ; although the purchaser at such discount, was a stranger to the original object for which it was made. The case in 4th *Cowan*, is so distinct in its features, and being merely a random expression of Judge *Southerland's*, cannot be considered as in the least shaking the previous train of decisions.

2 Mun. 36.

We will now examine the Virginia decisions on the question. The case of *Hansford* vs. *Baylor*,[a] seems to be a leading case. It was there decided that it was not usury, to purchase a note made for accommodation, at a greater discount than the legal rate of interest, if the purchaser was ignorant of the object for which the note was made. The court was composed of Judges *Tucker*, *Flemming*, *Roane*, and *Brooke*. The two first delivered opinions reversing the decree of the chancellor of the Richmond district—the other two concurred, but delivered no opinions. No authority is referred to, and the argument of counsel is not reported. The decision seems to have been rested by the court, on a want of privity between the borrower and lender, and it was thought by the court that there must be a concurrence of the will of both parties to make it usury.

b 1 Va. R. 42.

The next case we shall notice, is *Taylor, Adm'r of Holloway* vs. *Bruce*.[b] This too was a proceeding in chancery, against the purchaser of an accommodation bill, drawn and indorsed for the sole accommodation of the makers—it was placed in the hands of a broker, who procured it to be discounted. In the answer of the purchaser, he said he did not recollect—that the broker informed him, he was acting as agent for the maker. The case was argued with great ability by most eminent counsel on both sides. The Court, composed of Judges *Roan*, *Coulter* and *Brooke*, sustained the authority of *Hansford* vs. *Baylor*. Judge *Roan* dissenting. Judges *Coalter* and *Brooke* rest their opinions mainly on the ground, that it did not appear from the evidence that the

purchaser knew the character of the note. Judge *Roan* in his dissenting opinion, supports fully the New-York doctrine, that the note was void in its original formation, and that the purchaser took it at his own risk. It appears from this dissenting opinion, that he had concurred with the Court, in its decree in the case of *Hansford* vs. *Baylor*, on the ground, that it did not appear but that the note from the maker in that case, to the first indorsers, had been founded on good consideration, and was a fair and *bona fide* transaction. He contended that a note made for accommodation, for the purpose of raising money, is nothing more than a blank paper, until it has been negotiated by being discounted—and that if such a note is discounted at a discount greater than that of lawful interest, it is void under the statute against usury, whether the person discounting it was acquainted or not with the manner in which it was made, and its object and design.

The next case we shall notice, is that of *Whitworth* vs. *Yancy & Adams.*[a] In this case a majority of the Court sustained the decision in *Taylor* vs. *Brown*. It was, however again a divided court. Judges *Carr* and *Green* delivered very able and elaborate dissenting opinions. They assumed the ground taken by Judge *Roan*, in his opinion before mentioned. Both held that the law merchant applicable to bills of exchange, was not to govern, but the common law. The Judges who composed the majority, were *Coalter*, *Cabell* and *Brooke*. It will be seen, that there has been no contrariety of decision on the important question in Virginia, but that they have been uniformly the same way. Yet when the great weight of talent, and the deserved reputation of the Judges who dissented, and their very able and learned arguments are considered, those cases cannot, as decided, have the same influence with us, as they would otherwise be entitled to. Judge *Roan* in his day, sustained a reputation for strength of intellect, independence of character, and judicial learning, surpassed by no jurist in our country. Judges *Carr* and *Green* have not been so much known to the profession; but

Metcalf vs. Watkins.

a5 Rand. 333

the great learning, research, and talent displayed in their dissenting opinions, sufficiently establish their claims for rank among the most eminent Judges of the land.

We have found nothing therefore in the adjudged cases, to disturb the opinion expressed in *Faris & Powell* vs. *King*. Let us take up, however, the question on principle, and see what will be the result. It will be agreed by all, that if a note is tainted with usury in its original concoction and for-formation, this taint, like the mark on Cain, will follow it through all its migrations, shiftings and changes, never to be purified, but continually presenting an insuperable bar to its validity. Those who support the validity of a note made for the purpose of raising money on usury, contend that the note is complete before it is discounted—and in this, it seems to me, consists the great error of the decisions in the Virginia courts. They have not attended sufficiently to what would be the legal effect of such a note or bill, if it were not discounted. It never could be sued on between the original parties for the want of a consideration. No consideration is paid until a new party is made—who comes in by discounting it at usurious interest. Judge *Carr* presents his views on this point with so much force and perspicuity, that it would be injustice to him to abridge them. He says " there must be two parties to every contract. I may draw a number of promissory notes payable to A. B. and C. &c. and finish them in due form. While I keep them in my desk or my pocket, they impose no obligation—they are waste paper merely. So, if I agree to purchase property for which I am to give a thousand dollars, and bond with three or four securities is required ; I execute my bond, and get my friends to sign as sureties : this is still a one-sided, imperfect transaction. The bond, as yet, binds nobody. There is no contract. It is the delivery which gives it life. Suppose, instead of a bond, the vendor preferred to take a promissory note with A. B. and C. as sureties ; I could execute the note payable to A. and get him together with B. and C. to indorse. This would

make them, in truth, surety for me just as effectually as if they had joined me in executing the bond. Or suppose the obligation took the form of a bill of exchange, I might draw on A. payable to my own order—he would accept—I would indorse it, and B. and C. would indorse after me ; still the note while in my hands would be mere waste paper. A. B. and C. to be sure, had agreed to become my sureties, and had signed the instrument in such a way as to put it in my power to bind them ; but they could only be bound when I became bound ; and that could only be when I delivered the bill or note upon a real transaction. If I never did this, though the time for which the note purported to run had elapsed, no one of the parties to it could sustain an action on it against another. It had never received the animating touch, and was still a lifeless body. So if I wish to raise money, at usury, a little caution must be used. A decent cloak. I get a friend to lend me his credit. He executes a note for me for one thousand dollars, payable at three months, which I indorse. While I hold this paper it is nothing—it imposes no obligation on my friend,—it is a mere preparation which I am making to get my money. When I part with it, then I give it being, and stamp its character by the nature of the contract I make. If I discount it beyond the legal rate, whether by myself or agent, it is usury. The note is usurious in its inception and void." To prove that a note or bill dates its existence from the first real transaction, he cites some English cases, to wit—*Ardin* vs. *Watkins*[a]—*Wells* vs. *Freeman*[b]—*Wallace* vs. *Henderson*[c]—*Davis* vs. *Richardson*.[d] These cases all fully sustain the position assumed by the Judge. What then was the first real transaction in the case before us? Until it had been discounted, no suit could have been sustained by any one of the parties who figured in the transaction. Neither Smith the payee, nor Ice the indorser, nor Roberts, the object for whose benefit it had been fabricated, were affected, until it was discounted by Watkins. That was the first real transaction, and it

*Metcalf vs. Watkins.*

[a] 3 East, 317
[b] 12 East 656
[c] 1 Camp. 45
[d] 5 Bar. and Ald. 657.

was that which breathed spirit and life into the otherwise va-
lueless and unavailable paper.   The first real transaction
stampt on it the impress of its own character.   Had it been
discounted at the legal rate of interest, or at one not beyond
such legal rate, it would have been valid : but its discount at
a greater than the legal interest, made it usury.   To sus-
tain the contrary doctrine, we must assume that the bill or
note was perfect and valid before it was discounted.   It is
further said, that usury is a crime, and cannot be committed
without the,intention to do so—that an innocent purchaser of
a note cannot be convicted of crime when he honestly suppos-
ed that the bill or note was based on a valuable considera-
tion—and to this extent went the opinion of the Judge in the
court below, as shown by another part of the bill of excep-
tions: yet nothing is more clear, than that a man may com-
mit usury *civiliter*, without ever having heard of the law for
its prevention.   Suppose he makes a contract for the loan or
use of money at a greater rate of discount or interest than
eight per cent.—the rate allowed by our statute ; but not
knowing the statute, he believes it authorises the amount he
has reserved in his contract ; now this contract would be void
under the statute, although neither of the parties, the lender
nor the borrower might know at what the statute had fixed
the legal rate of interest.   The question is not, whether the
lender intended to commit usury.   If he has stipulated for
more than the statute allows, usury is the inference of law.
If, however, in stating a balance, or in the calculation of in-
terest, there has been a mistake, when only the legal rate was
intended, there would be no usury.   There is nothing in the
first section of our statute, against usury, which operates on
the contract itself, that makes a corrupt agreement a neces-
sary constituent to render the contract void.   It may be well
to notice here an argument founded on the supposed partici-
pation of Metcalf in the fraud practised on Watkins.   It is
alleged by the plea, that when inquiries were made of Met-
calf concerning the bill, at the instance of Watkins before

discounting it, Metcalf replied " that it was all right." The rejoinder avers that the inquiry was directed to the mere fact of executing or signing the bill, and he replied that he did execute, or sign it. The inference drawn by Watkins may have been, and may reasonably be supposed to have been, that the bill was a good and valid one. It was urged that it was a fraud on Watkins by Metcalf, to conceal the true character of the transaction, and that he is estopped from taking advantage of his own fraud, by setting up the defence of usury. It seems to me, to be a full answer to this argument, that if the paper was made for the purpose of raising money, and it was raised at usury, that the fraud of the parties could not change the nature of the transaction, and purify it from the taint of usury. If Watkins was induced to believe, from the fraud of Metcalf, that the bill was a good one, and purchased under such fraudulent representations, his remedy could not be on the bill; because that was clearly void, and his remedy, if any, would be in a different form of action. This may be a hard case on Watkins. On a very memorable occasion in the history of our jurisprudence, when most enormous amounts of usury had been collected, to the ruin of the borrower in many cases, and when they sought to recover back the usury that had been paid, under the mistaken impression that the payment could have been coerced, we declared, that whatever might be the hardship of the case, we could not warp the principles of law to meet particular cases, and to relieve their oppressions ; and now, if the lender loses his debt by not having been sufficiently informed of the nature of the transaction in which he was participating, we must respond to him in the same language. We may, however, be permitted to say, that if our statute against usury is to be any thing more than a dead letter, or a mere cob-web restraint, which the dullest invention might sweep away at a breath— we must bring cases of the character of that before us, within its provisions. Were we to rule otherwise, nothing in the

13

Metcalf
vs.
Watkins.

form of a statute would be left more utterly feeble and use-less. The facility with which it would be evaded, would be a subject of derision to the dullest capacity that ever entered the money as a money lender (market). The testimony of a broker, in one of the cases from *Johnson*, I do not recollect which—is emphatic on this subject. He points out a way, as clear as noon-day, by which to evade the statute. He says, " I do not beliave the lender knew who the borrower was. I was not in the habit of letting the borrowers name be known." Nothing more would be necessary than to pre-pare the paper, and place it in the hands of a broker, with instructions not to let the person who should discount it, know for whose use the money was advanced.

From the views we have expressed, the charge of the court under the second plea was not on an abstract question, but was wrong in law, under the issue formed on that plea. We believe too, that Roberts' declarations ought not to have been admitted in evidence. If (as would seem to be the case) his interest was balanced, he was a competent witness, and of course better than his declarations, which were nothing more than hear-say testimony.

Let the judgment be reversed, and the cause remanded.


By Mr. Justice SAFFOLD :

I concur in the opinion that the judgment is erroneous, and must be reversed. I arrive at the same conclusion with Chief Justice LIPSCOMB, without subscribing to all the propo-sitions, illustrations, or reasons by which he is influenced. My views are fully expressed on all the principles necessarily involved in this case, in two previous decisions of this court. *Faris & Powell* vs. *King*,[a] and *Thompson* vs. *Jones*.[b] I was willing to investigate the subject on principle, and the autho-rity of other courts, notwithstanding our former decisions. The same has been done with the aid of elaborate and high-ly talented argument, but I have not been enabled to change my opinions as before expressed, on any material point em-

[a] 1 Stew. 255
[b] 1 Stew. 256

braced. I would not, however, be understood to concur, on this occasion, in the extenssion of any principle' further than before declared.