German Bank v. DeShon.

---

## GERMAN BANK v. DESHON.

1. **PROMISSORY NOTE:** *Payable to order of maker, when complete.*
   A promissory note payable to the order of the maker and endorsed, does not become an operative contract, binding upon the maker and endorsers, until it is negotiated by the maker.

2. **SAME:** *Made to borrow money: Usury.*
   When a promissory note, payable to the order of the maker and endorsed, is made for the purpose of borrowing money, and the party to whom it is negotiated, by agreement between him and the maker before delivery, obtains the note at a greater discount than would be the interest at ten per cent. on the amount he pays for it to the maturity of the note, and the parties to the loan intended to pay and receive a greater rate of interest than ten per cent. per annum, the transaction and note will be usurious and void as to principal and interest, and as to both the maker and endorsers.

3. **USURY:** *The corrupt agreement: Ignorantia legis.*
   To constitute the corrupt agreement which constitutes usury it is not necessary that the parties intended to violate the law. If it was the intention of the one to reserve and the other to pay more than the rate of ten per cent. per annum on the amount loaned, it is, in the sense of the law, a corrupt agreement and void for usury, whether they knew the interest to be usurious or not.

4. USURY:  *Bona fide holder*.

 A note usurious in the hands of the payee is also usurious and void in the hands of a subsequent purchaser, though he purchased in good faith before the maturity of the note and without any notice of the usury.

 This is an exception to the general rule, that protects a *bona fide* holder of negotiable paper, though founded upon an illegal consideration. The reason is that the *statute* makes the usurious note void and it can gather no validity by circulation.

5. USURY:  *Act of Feb. 9, 1875, unconstitutional.*

 So much of the act of February 9, 1875, as attempts to validate a usurious contract in the hands of a *bona fide* holder or endorsee for a valuable consideration, and without notice of the usury, is unconstitutional and void.  [EAKIN, J., dissenting].

APPEAL from *Pulaski* Circuit Court.

M. L. RICE, Special Judge.

*U. M. Rose*, for appellant.

The note is a negotiable instrument, *Gantt's Digest, sec. 566,* and the bank is an innocent holder for value before maturity and by *sec. 4, Act Feb'y 9, 1875,* the note is valid, notwithstanding any usury between original parties.

Although the language of the Constitution makes usurious contracts *void*, yet the word "void" has been construed to mean "voidable" in many cases. *2 Hill, 522*; *13 Mass., 518*; *3 Met., 448*; *3 Cowen, 89.*

Though a statute provide that a negotiable instrument shall be void, it is nevertheless valid in the hands of an innocent holder. *2 Hill, 522*; *10 John., 195*; *Cro. Jac., 33*; *Yeld., 47*; *1 Ld. Raym., 87*; *2 N. H., 410*; *3 N. H., 119*; *7 Cow., 13.*

Usury is a personal plea and can only be pleaded by the borrower. An indorsee can not plead usury between the original parties. *Bayley on Bills, ch. 12, p. 368–9*; *Edwards on Bills and Notes, p. 289*; *32 Conn., 550*; *8 Ind., 352*; *3 Ala., 458*; *21 Iowa, 36*; *4 Dana, (Ky,) 181*; *13 Mass., 515*; *1 Mich., 84*; *37 N. Y., 218*; *33 Vt., 533*; *5 Leigh, (Va.) 478.*

The additional ten dollars, paid by Fatherly, was compensation for Blocher's trouble, made without any prior agreement, and did not render the note usurious.

*J. M. Rose* and *Geo. L. Basham*, for appellant.

To constitute usury there must be an intent to take illegal interest, or knowingly contract for usurious interest. *25 Ark., 260; 9 Ark., 22; 25 Id., 195; 4 Id., 55, 410; 26 Id., 359; 9 Peters, 378; Tyler on Usury, 103, 107, 108; 21 N. Y., 219; 4 Pet., 205; 9 Pet., 399; 2 Black., 865.*

If the transaction was not usurious in its inception no after transaction can make it so. *17 Conn., 441, 453; 7 Peters, 104.*

The bank is an innocent holder, and not made to suffer except upon the clearest proof. *18 Gratt, 873.* The taking of more than legal interest is not sufficient to make a *prima facie* case. *25 Ark., 195; 4 Id., 410; 26 Id., 359.* When the defense is usury the burden of proof is on defendant. *21 Wis., 320; 20 Ill., 434; 4 Ind., 221; 3 Blackf., 267; 5 Id., 334; 7 Id., 344; 31 Me., 155; 9 Barb., 619; 9 Rich. (S. C.), 75.*

Compensation for services, commissions or brokerage cannot be added to the interest and thus render the transaction usurious. *18 Ark., 463; 25 Id., 195; 21 N. Y., 531-9; 38 N. Y., 218-8; 37 N. Y., 356; 2 Sweeney, 160; 15 Vesey, 120; 2 Tenn., 52; 2 Conn., 341; 8 Id., 513; 4 Id., 604; 30 Id., 175-9; 2 Keys, 41, 47; 1 Hilton, 532.*

The bank being an innocent purchaser for value would take a good title even if the note were tainted by the usury of prior parties. *Acts 1875, p. 146, sec. 4; 8 Ark., 167; 3 Gratt, 246; 16th Q. B., 244,* etc.

*John McClure*, for appellee.

"All contracts for a greater rate of interest than ten per

cent. per annum shall be void as to principal and interest,'" sec. *13, art. XIX, Const. 1874.* "A note void *by statute* is void in the hands of a *bona fide* holder." *5 Mass., 286.*

The note had its *inception* when it passed into the hands of Blocher, and not before. It was payable *to the maker* and no action could have been maintained upon it *before the delivery to Blocher. 65 N. Y., 523; 22 Id., 312.* If void in the hands of Blocher no subsequent transfer could give it validity. *Supra,* and *14 Sup. Ct. (N. Y.), 576; 6 Wend., 615; 36 Barb., 585.*

Blocher was not a *banker* and had no right to discount the note. *22 Ark., 414.* And the receiving of interest *in advance,* gives more than ten per cent. per annum on the money *actually loaned,* and is usurious. *Ib.*

A subsequent taking of more than lawful interest is not *conclusive* evidence of usury, but if unexplained it is *presumptive* and *very strong evidence* of a usurious contract. *2 Cowen, 705; 1 Kern. (N. Y.), 368; 4 Comst., 364; 10 Ind., 57.* The payment and receipt of usurious interest is *prima facie* evidence of a corrupt agreement. *Tyler on Usury, 276 ; 2 Cowen, 678; 3 Id., 284,* and it became the duty of appellant to show that that which appeared to be usurious was the result of *accident or mistake.*

The act of February 9, 1875, is unconstitutional. The legislature has no power to make a contract which is declared void by the constitution, good *in the hands of any one. The constitution makes no exceptions and the legislature cannot interpolate them.*

BATTLE, SPECIAL JUDGE.    William A. Fatherly executed his promissory note, bearing date the eighth day of July, 1878, and thereby promised to pay, ninety days after the date thereof, to his own order, the sum of sixteen hundred and fifty dollars, and ten per centum per annum interest thereon from the maturity of the note until paid, and

Francis' E. Ashley and A. G. DeShon endorsed it. The note was executed and endorsed for the purpose of borrowing money. After Ashley and DeShon en-- dorsed the note, William D. Blocher gave Fatherly his check on the German bank for the sum of six- teen hundred and eight dollars and seventy-five cents, and Fatherly endorsed and delivered the note to Blocher... Fatherly collected the check and paid Blocher the sum of ten dollars. Blocher transferred the note to the German bank and received a credit on his account with the bank for the sum of sixteen hundred and eight dollars and seventy-five cents. After this, DeShon delivered to the bank the sum of four hundred dollars. The bank brought suit on the note against Fatherly, DeShon and Ashley. DeShon an- swered, setting up usury and claiming a set-off for the four hundred dollars, and the bank replied, denying the set-off. The other defendants did not answer. A trial was had and a verdict was returned in favor of DeShon against the bank for the sum of four hundred dollars.

The court below instructed the jury, at the instance of DeShon, substantially, as follows :

That contracts for a greater rate of interest than ten per centum per annum are void as to principle and interest. That the paying and receiving of a greater rate of interest than ten per centum per annum on a loan of money is prima facie evidence of a corrupt agreement, notwithstand- ing the parties to the loan acted in ignorance of the law. That a note payable to the order of the maker has its incep- tion when it is delivered by the maker to some one for value or as evidence of a contract and not before, and the person to whom it is so delivered for the first time is the payee, although not named in the note. That if Blocher gave Fatherly his check for sixteen hundred and eight dol- lars and seventy-five cents, and upon the delivery of the check, received the note for sixteen hundred and fifty dol--

lars, and the check was paid, and Fatherly, afterward, under an agreement between himself and Blocher, made previous to the receiving of the check and the delivery of the note, paid to Blocher the sum of ten dollars or any other sum in addition to the sum of forty-one dollars and twenty-five cents already received in the discount of the note, and these sums of money amounted in the aggregate to more than ten per centum per annum interest for the time the money was loaned, and the same was knowingly done, the note would be void because of usury, although the parties to the transaction in so doing, acted in ignorance of the law; and was void in the hands of the German bank, notwithstanding it became the owner thereof, by paying a valuable consideration before maturity, and without notice of the usury.

That if they believed from the evidence, that the note sued on was usurious in its inception, and that DeShon deposited with the German bank the sum of four hundred dollars under a special agreement; that the contingency and purpose for which the deposit was made had not happened; and, that under the terms of the deposit, DeShon is entitled to a return of the same, they should find for DeShon in the sum of four hundred dollars.

And the court on its own motion, instructed the jury, among other things, "that if Blocher negotiated the note to the bank, as the agent of Fatherly, and took a commission for his trouble in making the negotiation, that such commission could not be added to the interest so as to constitute usury; but if Blocher gave Fatherly a check and took the note as his property, and afterwards negotiated it to the bank on his own behalf, it would make him the first payee of the note and would not constitute him the agent of Fatherly."

Is there any error in these instructions?

The thirteenth section of article nineteen of the constitution of this State declares that "*all contracts* for a greater

German Bank v. DeShon.

rate of interest than ten per centum per annum shall be void
as to principal and interest.'' This section is clear and un-
ambiguous. With the wisdom and policy of it the courts
have nothing to do. It is their duty to carry it into effect
according to its true intent, to be gathered from its own
words, without regard to the hardships incident to the faith-
ful execution of such laws.

The note sued on was executed and endorsed for the
avowed purpose of borrowing money. It was payable to
the order of the maker, and did not become an operative
contract and binding on the maker and endorser until it was
negotiated by Fatherly. Until then it did not become a
promissory note and was not a subject of sale. The person
to whom he endorsed and delivered it became the payee
therein, and the money advanced thereon, less whatever
sum the maker agreed, before the delivery thereof, to pay,
and thereafter paid to such payee, if any, for advancing,
became the consideration thereof, and it accomplished its
purpose by becoming a note for borrowed money. If such
consideration was less than the principal of the note and the
difference was greater than ten per centum per annum on
such consideration, from the date of the note to the maturity
thereof, and the parties to the loan intended to pay and re-
ceive a greater rate of interest than ten per cent. per annum,
the note would be void for usury. If, for example, Blöcher
gave his check for sixteen hundred and eight dollars and
seventy-five cents to Fatherly with the understanding, at
the time, that Fatherly would return or pay to him ten dol-
lars and transfer to him the note, and Fatherly, thereupon,
transferred the note to him and, thereafter, collected the
check and paid the ten dollars to him, with the intent afore-
said, the whole transaction was usurious, and the note was
void as to principal and interest, because there was inten-
tionally reserved—paid and received, a greater rate of inter-
est than ten per centum per annum on the money actually

1. PROM-
ISSORY
NOTE:
Payable
to order of
maker
and en-
dorsed,
when com-
plete.

2. SAME:
Usury.

loaned. · *Scull v. Edwards, 13 Ark., 24*; *Howe v. Potter, 61 Barb., 356*; *Young v. Wright, 1 Camp., 139*; *Ackland v. Pearce, 2 Camp., 599*; *Wilkes v. Roosevelt, 3 John. Cases, 66*; *Whitten v. Hayden, 7 Allen, 407*; *Tufts v. Shepperd, 49 Me., 312*; *Sylvester v. Swan, 5 Allen, 134*; *Bossange v. Ross, 29 Barb., 576*; *Aeby v. Rapelye, 1 Hill, 9*: *Cockey v. Forrest, 3 Gill and John., 482*; *Bynum v. Rogers, 4 Jones (N. C.,) L., 399*; *Ruffin v. Armstrong, 2 Hawks, 411*; *Dowe v. Schutt, 2 Denio, 621*; *Wallace v. The Branch Bank of Mobile, I Ala., 565*; *Sauerwein v. Brunner, 1 Harris & Gill, 483*; *Jones v. Hake, 2 John. Cases, 60*; *Munn v. Commission Co., 15 John., 44*; *Farris v. King, 1 Stewart, (Ala.), 255*; *and Richardson v. Scobee, 10 B. Mon., 12.*

Like the note, the endorsement of Ashley and DeShon had no binding force and did not become a contract until the note was negotiated, when it became a contract on the part of Ashley and DeShon with the person to whom it was passed, by which they undertook, among other things, to pay the note to such person, or other holder, provided the same was duly presented and was not paid by Fatherly, and due and reasonable notice was given to them of the dishonor. In the transfer and delivery of the note and endorsement, Fatherly represented himself and the endorsers, and by the same contract negotiated the note and endorsement, and made the consideration of each of these contracts the same. If the consideration of the note is usurious, so is that of the endorsement; if one be a contract for a greater rate of interest than ten per centum per annum, so is the other; and if one is void for usury, so is the other. The note and the endorsement of the accommodation endorsers are so intimately connected that they must stand or fall together; and the endorsers were entitled to make the same defenses the maker could have made. *Story on Promissory Notes, sec., 129; Rey v. Simpson,*

German Bank v. DeShon.

*22 How. ( U. S.), 341; Good v. Martin, 5 Otto, 90;
Ross v. Jones, 22 Wall., 589; Sawyers v. Chambers, 44
Barb., 42; Wilkie v. Roosevelt, supra; Gaillard v.
LeSeigneur & LeRoy, 1 McMullan, 229, and authorities
above cited.*

To constitute the corrupt agreement said to be necessary to constitute usury, it is not necessary that there be an actual intent to violate the statute or constitution.    Where parties to a contract for a loan knowingly agree to pay and receive more than ten per centum per annum for the use of the money borrowed, this, in the sense of the law, is a corrupt agreement.   If it be the real intention of the parties to receive or reserve a given rate of interest, and that rate proves to be usurious, the contract will be void for usury, whether the parties knew the interest to be usurious or not. Ignorance or mistake in relation to the law, in such a case, will and does not afford protection against the consequences of usury.   *New York Firemen's Insurance Co. v. Ely, 2
Cowen, 678; McGill v. Ware, 4 Scam, 29; and Metcalf
v. Watkins, 1 Porter, 96.*

If the note in question was transferred and delivered by Fatherly to Blocher, in consideration of money loaned, and it was void on account of usury in the hands of Blocher, it was likewise void in the hands of the German bank, notwithstanding it was transferred to the bank for a valuable consideration before maturity, and without notice of the usury.   It is true, as a rule, that a *bona fide* holder, who has received negotiable "paper in the usual course of business," as said by Mr. Daniel in his work on negotiable instruments, "is unaffected by the fact that it originated in an illegal consideration, without any distinction between cases of illegality founded in moral crime or turpitude, which are termed *mala in se*, and those founded in positive statutory prohibition, which are termed *mala prohibita.*. The law extends this peculiar protection to negotiable

3. USURY: The corrupt a- greement.

*Ignorantia legis.*

4. Void in- hands of innocent. assignee.

instruments, because it would seriously embarrass mercan-
tile transactions to expose the trader to the consequences of
having the bill or note passed to him impeached for some
covert defect." But there is one exception to this rule,
and that is, when a statute declares a contract void, it gath-
ers no vitality by its circulation in respect to the parties
executing it, but it and the instrument evidencing it are void
in the hands of every holder. *1 Daniel on Negotiable Instru-
ments, sec. 197 ; Young v. Berkley, 2 N, H., 410; Young
v. Wright, supra ; Howe v. Potter, 61, Barb., 356 ; Ack-
land v. Pearce, supra ; Wilkie v. Roosevelt, supra ; Bridge
v. Hubbard, 15 Mass., 95 ; Sauerwein v. Brunner, 1 Har-
ris & Gill, 477 ; Gaillard v. LeSeigneur, supra ; Solomon
v. Jones, 3 Brevard, 54 ; Hackney v. Sprague, 10 Wend.,
114 ; Lloy v. Scott, 4 Pet., 228 ; Thompson v. Berry, 3
John. Chy., 394 ; Fleckner v. U. S. Bank, 8 Wheat.,
354 ; Bowyer v. Bampton, 2 Stra., 1155 ; Townsend v.
Bush., 1 Conn., 262 ; Metcalf v. Watkins, 1 Porter, 57 ;
The City of Aurora v. West, 22 Ind., 88 ; and Dewing v.
Perdicaries, 96 U. S. Rep., 196.*

5. USURY:
Act of
Feby. 9,
1875, un-
constitu-
tional.

But it is said that the general assembly of this state, in
section four of an act entitled "an act regulating interest
and defining usurious contracts," approved February 9,
1875, enacted that no bill of exchange or promissory note,
void in its inception on account of usury, shall be void "in
the hands of an endorsee or holder who shall have received
the same in good faith and for a valuable consideration, and
who had not, at the time of discounting or receiving such
bill or note, or paying such consideration for the same,
actual notice that such bill or note had been originally
given for a usurious consideration or upon a usurious con-
tract." But is this section constitutional? We think not.
The language of the constitution is broad and comprehen-
sive. It says : "*All contracts* for a greater rate of inter-
est than ten per centum per annum shall be void, as to

principal and interest, and the general assembly shall pro-
hibit the same by law." "*All contracts*" include bonds,
bills, notes and all other contracts, verbal and written,
whereby a rate of interest greater than ten per centum per
annum is reserved, taken or secured, or agreed to be taken
or reserved, as fully and completely as if they had been
severally and particularly enumerated in the constitution
and declared void. The legal effect of this provision of
the constitution was to make bills, notes, and all other con-
tracts tainted with usury void in the hands of every holder.
The constitution made no exception as to persons, holders,
or contracts, and the legislature had no power or authority
to do so. So far from having power or authority, the con-
stitution expressly makes it the duty of the general assem-
bly to prohibit all such contracts by law.

The instructions of the court below to the jury are sub-
stantially correct. We see no error in them prejudicial to
the rights of appellant.

Was the verdict of the jury contrary to law and evidence?
The jury evidently found, first, that the note sued on was
transferred and delivered to Blocher by Fatherly in consid-
eration of a loan of money; secondly, that Fatherly paid
Blocher the sum of ten dollars in part consideration of the
money loaned, and that in the discount of the note and the
ten dollars there was paid to and received by Blocher, pur-
suant to an agreement coeval with the loan, more than ten
per centum per annum interest for the use of the money
loaned; and thirdly, that four hundred dollars was depos-
ited by DeShon with the German Bank on conditions which
were never performed.

As to the first of these facts found by the jury, Fatherly
testified that he presented the note to Blocher and requested
him to borrow money for him on it; that Blocher said he
had no money of his own, but that he knew where he could
get twelve hundred dollars; that he supposed Blocher was

his agent; that Blocher was to raise him some money; that on the next day after the conversation related he saw Blocher and Blocher told him he could let him have the money and gave him his check therefor on the German bank for $1,608.75; that he gave Blocher the note in question; that he collected the check and then paid Blocher ten dollars for his trouble; and that he paid Blocher altogether $51.75 for the money advanced on the note.

Blocher testified he was not the agent or broker of Fatherly; that he purchased the note with his own money and on his own account and gave his check on the German bank for $1,608.75; that he does not know how much he received from Fatherly as commissions, certainly not more than $8.75, or that he received anything, but thinks he did not; and that the note was his and he sold it to the German bank at ten per cent. discount.

C. T. Walker, the cashier of the German bank, testified, that on the ninth or tenth day of July, 1878, Blocher presented the note to the German bank, and the bank discounted it at less than ten per cent. per annum; and that the bank paid Blocher $1,608.75 for it, and credited that amount on Blocher's account.

As to the second fact found by the jury, the note, on its face, was notice to Blocher that it had no validity or operative force or effect as a note, when it was first presented to him, and that any money advanced upon it would be a loan. In fact, Fatherly testified, that it was presented to Blocher, with the request that he borrow money on it. In addition to this fact he further testified, that Blocher said he could let him have the money, and gave him his check on the German bank for $1,608.75, for the note; and that he collected the check and paid Blocher ten dollars. Why did he pay Blocher this ten dollars? For his trouble? There was no evidence that Blocher was at any trouble. He had discounted the note $41.25, and in that way had already re-

ceived a fair remuneration for the use of his money. Why did he receive an additional compensation? Could the jury come to the conclusion other than that the ten dollars was paid and received as a part of the consideration for the loan of $1,608.75, pursuant to an agreement coeval with the loan? There was certainly some evidence to support the jury in coming to this conclusion, and they were the sole judges of the weight that should be attached to it. *Hammett v. Tea, 1 Bos. and Pull., 143*; *Catlin v. Gunter, 1 Kernan, 372*; *New York Firemens' Insurance Co. v. Ely, 2 Cowen, 706*; *Andrews v. Pond, 13 Pet., 65, 80*; *Wright v. Wheeler, 1 Camp., 165*; *Towslee v. Durkee, 12 Wis., 480*; and *Price v. The Lyons Bank, 33 (N. Y.), 55, 57, 60*.

As to the third fact found by the jury, DeShon testified, that he proposed to the cashier of the German bank, to deposit the full amount of the note, if the bank would sue Mrs. Ashley on the note, and that the bank should have the deposit if it failed to collect of Mrs. Ashley the amount of the note; that the cashier agreed to this; that thereupon he deposited with the bank four hundred dollars, and was proceeding to make another deposit, when the cashier informed him that the bank would not sue Mrs. Ashley; that no one had any authority to credit the four hundred dollars on the note; and that he did not hear the cashier tell Thompson to credit the four hundred dollars on the note, and did not know that it was so credited until after the institution of the suit.

C. T. Walker, the cashier, testified that DeShon did not offer to deposit the amount of the note with the bank if plaintiff would sue Mrs. Ashley; that he understood the four hundred dollars to be paid as a credit on the note, and handed it to Thompson, who credited it on the note in DeShon's presence.

This was substantially the evidence before the jury. It was within their peculiar province to weigh it and determine the facts in the case. They returned a ver-

dict as before stated. The court who heard the evidence, and is therefore presumed to be better qualified to pass upon its weight and the credibility of the witnesses in the case than we are, refused to disturb it. It was sustained by evidence. It is not for us to decide whether we would have returned a like verdict or believe the evidence properly weighed.

The judgment of the court below is, in all things, affirmed.

EAKIN, J., DISSENTING. I am unable to concur in the opinion of the court.

The jury have found that the instrument in question was given to the first holder upon an agreement which was usurious. In other words, they find, in effect, that the loan was made by Blocher, who took the instrument as his security and as his property. The finding of usury cannot consist with the view that the loan was made by the bank, and that the transaction was not complete until the note was discounted by the bank. The bank, as is clearly shown, discounted the note for Blocher, at his own request and passed the proceeds to his credit. It had, upon its face, all the characteristics of negotiable paper. The bank had no notice of the usury, nor any reason to doubt that the note was Blocher's. It discounted the note before maturity, in the usual course of business, and at legal rates. The anomalous and inconvenient attitude which our State had for a long time occupied, from the first year of her existence ; allowing against indorsees without notice all defenses which might have been set up against the payee, was not productive of serious inconveniences amongst a community of farmers and planters. It was felt, however, with the rise of commercial interests, and the policy was changed. By act of April 24th, 1873, bills of exchange and promissory notes, transferred before maturity in good faith, and for value, were made to be governed, here as elsewhere, by

rules of the law merchant, and thus our State came into harmony with other civilized and commercial nations.

Although the exceptions *against* the negotiability of commercial instruments, fair upon their face, were based upon what seemed very technical grounds; yet it may be conceded to have become the settled rule both in England and America, that where a statute declares an instrument to be void, whether bill, bond, note or other security, it shall by force of the statute remain so even in the hands of an innocent indorsee for value. Such was the force of the old statutes against usury now happily changed in England. The statute was obeyed as tyrannical, rather than approved as reasonable. There never has been a time, however, when the courts have not felt that this was in serious contravention of an enlightened commercial policy; and they have taken care that no other classes of void contracts, however absolutely null between the parties, shall come within the exception save where the statute expressly declares that the note, bond, bill, or other instrument, by which it is evidenced or secured, shall *itself* be void. The courts have ever held that a contract may be void, as immoral, or against the policy of the law, or against the prohibitions of a statute which does not expressly provide that the instrument executed upon it shall be void; yet, if it be made the foundation of a note or bill in form assignable by the law merchant, it will be good in the hands of an innocent holder. That is to say, that although the contract be void, yet when evidenced by a negotiable paper and actually negotiated, it passes under the protection of the law merchant and from high considerations of public and international policy, must carry with it the credit which the names of the parties may give it.

Notwithstanding some carelessness of expression in the remarks of judges, when the cases themselves are considered, I think the authorities in support of the principle are

uniform and unquestioned. *Danl. on Neg. Inst., vol. 1, secs. 197 and 198.* Mr. Chitty, in his work on bills, *Marg., p. 95,* states the rule thus : "In those cases in which the legislature has declared that illegality of the *contract* or consideration shall make the *security*, whether bill or note, void, the defendant may insist on such illegality, though the plaintiff or some other party between him and the defendant took the bill *bona fide* and gave a valuable consideration for it. * * * * But, unless it has been so *expressly declared* by the legislature, illegality of consideration will be no defense, in an action at the suit of a *bona fide* holder for value, without notice of the irregularity, unless he obtained the bill after it became due.

To the same effect have been the great mass of American authorities, and gaming and usurious contracts are often cited as notable instances of exceptions to the commercial policy of making all negotiable paper, regular upon its face, good in the hands of an innocent indorsee, for value, before maturity. (See remarks of Savage, Ch. J., in the case of *Vallet v. Parker, 6th Wendell, 619*). The exceptions are based upon the language of the statutes.

Within three months of the passage of the act in this state, which as construed by the court, destroyed the *commercial* value of bills and notes, an act was passed (February 16th, 1838,) fixing rates of legal interest, and declaring void all securities given upon usurious contracts, with a proviso which cannot but seem strange, in view of the positive antagonism elsewhere exhibited to the negotiability of commercial paper. It was provided that the act should not extend to any bills of exchange or "promissory notes in the hands of an indorsee or holder, who shall have received the same in good faith, and for a valuable consideration, and who had not at the time of discounting or receiving such bill or note, or paying such consideration for the same, actual notice" of the usury ; thus placing upon a commercial

footing one class of contracts alone, which in England for a long time, and in some of the states, had been excluded from that protection. *Gould's Digest, Title "Interest"*.

Afterwards, by one clear sweep, *Cons. '68, sec. 21, art. 15*, and by act of July 13, 1868, all usury laws were effectually abolished, and the plea of usury forbidden as a defense in any action. *Gantt's Dig., Title, "Money and Interest"*. It may be said there were no existing laws on the subject, in force in the state, when the convention assembled, which proposed to the people the constitution of 1874. It is matter of public history that the evils of allowing unlimited rates of interest had become flagrant and startling. The matter was deemed of such consequence as to require restraint upon the legislature, in the organic law of the government. Sec. 13, of art. XIX, provided that "all *contracts* for a greater rate of interest than ten per cent. per annum shall be void as to principal and interest, and the general assembly shall prohibit the same by law, but where no rate of interest is agreed upon, the rate shall be six per cent. per annum."

The first legislature which assembled under this constitution, by act of February 9, 1875, after prohibiting all persons from taking or receiving, in money, goods, or other valuable things, any amount of interest, over ten per cent. per annum, enacted by sec. 3, that "all bonds, bills, notes, assurances, conveyances and all other contracts and securities whatever, whereupon or whereby there shall be reserved any greater sum, or greater value for the loan or forbearance of any money, goods, things in action, or any other valuable thing, than is prescribed in this act, shall be void."

By sec. 4, it was enacted that the provisions of the last section should not extend to any *bill of exchange or promissory note* in the hands of an indorsee or holder, who had received the same in good faith, for valuable consideration, without notice at the time of the usury.

Is this 4th section *clearly* unconstitutional? If not, it must prevail ; a fair doubt must save it.

A critical examination of the language of the constitutional provision discloses two things which arrest the attention : Almost all the statutes, which in England and America had been leveled against usury, had declared that the *bond* or *note* or other *security* given upon the usurious contract should be void. It was this language which seems to have constrained the courts, to follow *securities*, so condemned, into the hands of innocent holders, and to deprive them of all commercial character ; whilst other notes or bills based upon contracts which the law held void, as immoral or against public policy, or positive statutes, were held good, when assigned *bona fide*, for value, without notice. Can any one say there is less of turpitude, for instance, or illegality, in a contract for illicit cohabitation, than in a contract for too much interest on money? Are they not equally void? As *contracts* they are. But when evidenced by a peculiar form of instrument given to secure payment, those instruments which under the law merchant, become negotiable ; then, in the interests of commerce, and to subserve a higher policy, they are generally held valid in the hands of an innocent holder. The cases where they are not so held are exceptional, and are based upon the language of statutes, which directly and pointedly declare without qualification that the bill, or note, or other security, shall be void.

It must be remembered that commercial paper is *sui generis*. The rules which govern it are peculiar, and it has a peculiar value, analogous to that of money. It is something more than a chose in action. It serves the purposes of exchange. It is property. Replevin will lie for it. It cannot be truly said of it, as of other contracts, that being void it must remain so of necessity ; that no life can be infused into it by transfer. A *contract* to pay a sum

German Bank v. DeShon.

of money for any illegal act is void. A note given to secure the payment is equally so. Yet by the general law it will become a living thing by endorsement to an innocent holder, unless there be some expression in a statute to prevent it, applicable to the note itself independent of the contract on which it is founded. This happens in every case where a note or bill, worthless to the payee on account of its origin, acquires vitality by assignment for value, before due and without notice, without the distinction between the commercial security and the contract out of which it arose, the decisions of the courts are wholly unintelligible. The contract may be void and the *bill* or *note* embodying it may become good by transfer.

Without this point in mind, the expression of judges and text writers have led to confusion by the interchangeable use of "contract" and "bill" or "note," but a review of the authorities both in England and America will show that bills or notes or other commercial paper had never been held void in the hands of innocent holders merely because the contracts out of which they grew were void, but *always* in the few cases where it has been done, because the language of the statute was stern and peremptory to make void the instrument itself, whether bond, bill, note or other assurance. In the case of *Jackson v. Henry*, *10 John.*, *196*; KENT, CH. J., remarked: "The case of *Lowe v. Walker*, (*Doug. 736*), was an action brought by an innocent holder, upon the very bill of exchange given on an usurious consideration, and the court of K. B. felt themselves bound, though with visible regret, by the peremptory words of the statute, and by the case of *Bowyer v. Bamptowl*, (*2nd Strange*, *1155*), which was a gaming note under the statute of 9 Anne, and which equally declares the *security* void. *This is the greatest length to which the courts of England have gone* to the prejudice of an innocent party." With this disposition, I think it

cannot be doubted that the K. B. would have held the secur-
ity good if the words of the statute had only been directed
against the contract, making *it* void, as all contracts are
made by the courts, which spring from immoral considera-
tions, or contravene public policy ; and had not directly and
pointedly declared that *the security* should be void.    The
same effect, by virtue of the same peremptory language,
would have been given to our own old statute against usury
but for the saving clause which protected commercial pa-
per in the hands of innocent holders.

    The first of the points above alluded to, in consideration
of the clause of our constitution now in question, is :
That the makers have thought fit to avoid the *contract* of
usury, and have refrained from using any apt language
avoiding the *security* or *instrument* given upon it.    It is to
be presumed that its framers were advised of the English
statutes against usury, and the decisions upon them, which
had held commercial paper based upon usurious contracts,
void in the hands of innocent holders ; not because the usu-
rious contracts were so, but because parliament had declared
that the instrument, or security itself, should be.    It is
further to be presumed that the framers knew that the
courts of England and America had, in favor of commerce,
persistently held that in the great mass of void contracts
commercial paper given to secure their performance, would
be protected in the hands of innocent holders ; and were aware
also, of the past policy of our State under former usury
laws, to protect usurious instruments in like circumstances.
Perhaps it is not too much to presume, also, that they were
aware of the strong tendency of more modern legislation in
equity to relieve commercial paper of such embarrassment.
It is a fact that since the ealier and more rigid statutes in
that country, other acts have been passed of a like nature
with our own former act, saving usurious paper in the
hands of innocent holders, although it is still made void as

to the parties, and all others taking it without considera-
tion, or with notice, or after due. These considerations,
although by no means conclusive, are very potent in lead-
ing the mind to conclude, that if the constitution had meant
to restore the old rigor of the law, and to provide that
in all time the legislature should be precluded from
giving such *securities* or any vitality in the hands of inno-
cent persons, it would have used language more direct to
the purpose than, under the decisions of the court, can be
implied from making the contracts void. The lawyers in
the body could not have rested satisfied with such a vague
declaration, in the face of the rule adopted by all of the
courts and so clearly stated by Mr. Justice Rodman in *Glen.
v. The Farmer's Bank*, *70 N. C., p. 206*, as follows :
"If a statute declares a *security* void, it is void in whoso-
ever hands it may come. If, however, a negotiable securi-
ty be founded on an illegal consideration, (*and it is imma-
terial whether it be illegal by common law or statute*), and
no statute says it shall be void, *the security is good*, in the
hands of an innocent holder, or of any one claiming through
such a holder."

Another point in the clause which attracts attention, is :
That whilst it is self-executing, it seems to impose some
duty still upon the legislature, in order to carry into effect
its true spirit. It fixes, determinately, that usury shall be
no longer lawful—the taking of greater interest than is
therein specified—and that all contracts for that purpose
shall be void. But so are all other legal contracts in one
sense. What is the legislature called upon to do by way
of prohibition more than has been done by the constitution
itself, if *ex vi termivi* it meant to avoid all *instruments* exe-
cuted on usurious contracts? It is not unreasonable to
suppose that the constitution, whilst inserting that usurious
contracts should be always held void, meant nevertheless
to leave it with the legislature to regulate the effect and

·consequences of those void contracts upon the securities given to enforce them, or the transactions based upon them, in a manner consistent with the protection of innocent parties.

It would be attended with the gravest consequences to hold that the contract with all that depends upon it must, in all cases, be *absolutely* void beyond legislative control. That in, its logical result would be more far-reaching, and more disastrous than we can conceive it possible to have been in the view of the framers of the constitution. A literal construction of that kind, with a rigid adherence to log-·ical consequences, would not only avoid between the parties every deed of trust, with power of sale, given to secure a usurious debt, but upon the sale, would prevent any title ·from passing to an innocent purchaser, after he may have paid the money, and conveyed with warranty, or made val-·uable improvements. The mortgagor might at any time ·within seven years recover the land. For the mortgage and note would, under the construction contended for, be all included in the usurious contract, and being absolutely void, would not be foundation for any title. Such conse-·quences would in time unsettle all property in the State, and the legislature, stifled by a constitutional restriction, ·could not arrest the evil. It could never give validity to ti-·tles so acquired. Other instances of logical results equally shocking may be easily imagined.

The first legislature which sat, after the adoption of the constitution, seems to have been desirous of doing its duty in the premises, and has passed a law, in furtherance of the ·constitutional policy. It went further than the constitu-·tion and expressly avoided all bills, bonds, etc., executed ·upon usurious considerations, with a saving of commercial paper.

The recognized rule of comity governing the courts, in ·connection with the legislative department, is that the

power and policy of the latter shall be sustained unless *clearly* unconstitutional. Each department, in the first instance, construes the constitution for itself. That is the sworn duty of the members. Whilst it is the duty of the courts at last to restrain any violations of that instrument by any other department, it should pay such deference to the views of the co-ordinate departments as to refrain from interference where there is room for fair and reasonable doubt. I cannot say that the act of 1875 is clearly unconstitutional; and solving the doubt in favor of legislative action, I think we should sustain it. I think the note in the hands of the bank is valid.

Hon. E. H. ENGLISH did not sit in this case.